IN

# THE SUPREME COURT

OF

## THE STATE OF MISSOURI,

### OCTOBER TERM, 1857, AT ST. LOUIS.

———●○●○●———

## CITY OF CARONDELET, Appellant, v. CITY OF ST. LOUIS, Respondent.

1. The act of Congress of June 13, 1812, *proprio vigore*, vested in the inhabitants of the various towns and villages designated in the first section of said act the absolute legal title to the common possessed and used as such by them respectively prior to December 20, 1803.

2. To enable the inhabitants of a town or village designated in said act to assert title to, and recover possession of, land as common confirmed by said act of June 13, 1812, no United States survey is required; proof of possession and user as common prior to December 20, 1803, is sufficient.

3. The approved U. S. survey of the common of St. Louis is not conclusive as against the inhabitants of the adjacent town (now city) of Carondelet. It may be shown in their behalf that land embraced within said survey was used and possessed prior to December 20, 1803, as common of Carondelet; and that too although it is not embraced within the U. S. survey of the common of Carondelet.

4. An approved United States survey of the common confirmed to the inhabitants of a town or village by the act of June 13, 1812, is *prima facie* evidence of the true location and extent of such common.

5. Such survey would not, however, be conclusive and binding upon the inhabitants of such village unless accepted; it might be shown that it had never been accepted, and that it was incorrect.

6. No formal act is necessary to constitute an acceptance; it may be inferred from various acts and circumstances; and it is the province of the court to declare to the jury, as a matter of law, the legal effect of such acts and circumstances.

*Appeal from St. Louis Land Court.*

The city of Carondelet seeks in this action to recover possession of certain lots of ground in the possession of the city of St. Louis. Carondelet asserts title to said lots under the act of Congress of June 13, 1812, as a portion of the common confirmed to her by said act. The city of St. Louis also asserts title thereto as common confirmed to her by said act of Congress.

At the trial the testimony of sundry aged persons (Antoine Smith, Pierre Chouteau, jr., Amable Chartrand and Paul Robert), familiar with the location and boundaries of the commons of Carondelet and St. Louis, as possessed and used by said villages respectively prior to December 20, 1803, and since, was introduced and relied upon by plaintiff. From this testimony it appeared that during the Spanish domination, and at the time of the change of government, the recognized boundary line, separating the common of St. Louis from the common of Carondelet, commenced at a point on the bank of the Mississippi river known as the "Sugar-loaf," and from thence ran to the north-east corner of the common field of Carondelet; that previous to the change of government there had been a fence running from the "Sugar-loaf" to the said corner of the said common field; that the inhabitants of St. Louis used as common the land lying north of said boundary line and fence, while the inhabitants of Carondelet possessed and used as common the land lying south of said line, including the land in controversy. The plaintiff also introduced in evidence an order of the St. Louis court of common pleas, dated November 9, 1819, incorporating the town of St. Louis upon petition of the inhabitants, and designating a line running due west from the "Sugar-loaf as the southern limit of the corporation, and ordering the metes and bounds

to be surveyed and a plat thereof recorded; also a survey of the limits of the town as thus incorporated, made in the year 1820 by Joseph C. Brown, in execution of said order, which bounded said town by a line running due west from the "Sugar-loaf."

The defendant then introduced in evidence the approved U. S. survey No. 3125, made in the year 1832, of the St. Louis common. This survey includes the land in controversy in the present suit—the south line of the common of St. Louis being located south of the "Sugar-loaf" and south of the land in controversy. Defendant also introduced in evidence the survey (No. 3102) of the common of Carondelet, made in the year 1834 by Joseph C. Brown, deputy surveyor of the United States. This survey did not include the land in controversy.

The plaintiff then offered in evidence the instructions for a survey of the common of St. Louis, dated November 18, 1832, given by Elias T. Langham, surveyor general of Illinois and Missouri, to Joseph C. Brown, deputy surveyor; also a survey of St. Louis common, made by James Mackey in the year 1806, and purporting to have been made at the request of the inhabitants of St. Louis, and offered to prove that it did not include the land in controversy; also offered to prove that the inhabitants of Carondelet always claimed the land north of the town or village of Carondelet to the "Sugar-loaf" and the north-east corner of the common field of Carondelet as common of Carondelet down to the year 1852; that up to the year 1836 the said land lay open and was used for pasturage and wood by the inhabitants of Carondelet; that when Brown surveyed the common of Carondelet in 1834 the inhabitants of Carondelet claimed their common's line on the north from the "Sugar-loaf" to the north-east corner of the common field of Carondelet; that said Brown ran said line [from the Sugar-loaf to the north-east corner of the common field] as the north line of the common of Carondelet in the presence and under the claim of a great number of the inhabitants of Carondelet; that said Brown

returned the said north line with the survey of the common field, and fraudulently omitted to return it with the survey of the common of Carondelet, and fraudulently returned another line three quarters of a mile south of said true line so claimed and run as aforesaid; that the inhabitants of Carondelet were people who spoke the French language and not the English; that they were a primitive, innocent people, not acquainted with the language, or laws or customs of the United States; that they believed that their line had been run on the north by the surveyor of the United States, and that they were the parties in the rightful possession; that they protested against the encroachments of St. Louis at various times from 1836 to 1853, and claimed the said land before the common council of St. Louis many different times and before the Land Department of the United States as the land of Carondelet before the bringing of this suit; that no copy or plat or report of Brown's survey of the common of Carondelet was sent to or returned to the commissioner of the General Land Office at Washington until the 22d day of June, 1839. Plaintiff also offered in evidence various documents, consisting of the official correspondence of the surveyor general of Illinois and Missouri, the solicitor of the General Land Office, the commissioner of the General Land Office, and the Secretary of the Interior, tending to show that Brown's survey had been disapproved by the commissioner of the General Land Office and the Secretary of the Department of the Interior. The plaintiff also offered to prove that the inhabitants of Carondelet protested before the commissioner of the General Land Office and the Secretary of the Interior against the survey of their common by Brown in 1834; that they proved before said Brown, when he made said survey, that the true north line of their common ran from the "Sugar-loaf" to the north-east corner of the common field of Carondelet. Plaintiff also offered to prove by experienced surveyors and others that the surveys of the commons of St. Louis and Carondelet do not conform to the confirmations or either of them, and that the instructions under which the surveys were made

were violated and disregarded ; that said surveys were made in violation of law and of the act of Congress of June 13, 1812.

The court, on motion of defendant, excluded the evidence. The defendant then introduced in evidence, against the objection of plaintiff, the United States survey of the outboundary line of the village of Carondelet. The land in controversy was not embraced within this outboundary line.

The plaintiff then offered to prove that said plat was constructed in the office of the surveyor general in the year 1853, without any actual survey on the ground, from erroneous plats of other surveys ; that no inhabitant of Carondelet was called upon to prove the true or actual outboundary of said town ; that no official or other notice was given to said inhabitants to attend and do so ; that the north line pointed out and proved to Brown by the said inhabitants and run by said Brown in 1834, was fraudulently suppressed by him from the return of the survey of the common, but appeared on the plat of the survey of the common field of Carondelet; that the said outboundary, as constructed, followed the fraudulent survey of 1834, and that the clerk constructed said map of the outboundary line and did not make any of the surveys on the ground from which it was constructed, nor go on the ground to do so or to verify the same ; that there are not and never have been any such notes of survey in the surveyor general's office as are referred to in the caption of the map of said outboundary line. The court excluded the evidence.

The following instructions asked in behalf of plaintiff were refused by the court: " 1. All the right, title and interest of the United States .in and to the commons of the village of Carondelet was vested in the inhabitants of said village on the 13th day of June, 1812, according to the extent and boundaries of the said commons, as the same existed and had been claimed and used by the said inhabitants as common prior to and until the 20th day of December, 1803. 2. If the jury find from the evidence that the land in controversy is within the commons of the village of Carondelet, as the same

City of Carondelet v. City of St. Louis.

was claimed, used and possessed by the inhabitants of said village prior to and until the 20th day of December, 1803, the title of the United States thereto was vested in the said inhabitants on the 13th day of June, 1812. 3. The surveys No. 3102 for Carondelet commons and No. 3125 for St. Louis commons are each of them *prima facie* evidence of the extent and boundaries of the respective commons of the said villages of St. Louis and Carondelet, and the burthen is on the plaintiff of proving that said surveys are incorrect, and that the true boundaries of the Carondelet commons, if correctly surveyed, would include the land in controversy, and that the true boundaries of the St. Louis common, if correctly surveyed, would not include the land in controversy. 4. The plat of the outboundary lines of the village of Carondelet, purporting to include the out-lots, common field lots, village lots and commons, given in evidence, is *prima facie* evidence that the commons of Carondelet, as confirmed by the act of 13th June, 1812, were within said outboundary lines; and if the land in controversy is not included within said lines, the plaintiff can not recover, unless the plaintiff has proved to the satisfaction of the jury that said outboundary lines are incorrect, and that the true or correct outboundary line, so run as to include the village lots, out-lots, common field lots and commons, would include the land in controversy. 5. If the jury find, from all the evidence in the cause, that the land sued for is within the commons of Carondelet, as the same was used, claimed and possessed by the inhabitants of said village prior to and until the 20th day of December, 1803, and is within the outboundaries of said village, when so run as to include the out-lots, common field lots, village lots and commons thereto belonging, then the plaintiff is entitled *to recover in this action the land sued for*. 6. If the jury believe from the evidence that the plat called an outboundary of Carondelet was not made by actual survey on the ground; that it was constructed by a draftsman in the office of the surveyor general for Illinois and Missouri; that it was made by retracing the lines of Brown's survey, purporting

to be for commons of said village of Carondelet, of 1834, and the lines of the common fields; that said survey of commons by Brown, of 1834, was fraudulently made, with intent to cheat and defraud the village of Carondelet and the inhabitants thereof, and that the plat of said survey of 1834 was constructed upon fraudulent returns made by said Brown— then the said plat of outboundary so constructed does not conclude or estop the plaintiff from recovering so much of the premises sued for as were actually claimed, used and possessed by the inhabitants of the village of Carondelet as commons belonging to said village prior to and until the 20th day of December, 1803. 7. If the jury find from the evidence that a direct line from Sugar-loaf mound to the northeast corner of the common fields of Carondelet was the true northern line of the commons of Carondelet; that the specific land bounded north by said line from the Sugar-loaf · mound to the said common fields' north-east corner, east by the Mississippi river, south by the village of Carondelet, and west by the front fence on the east line of the said common fields, was claimed, used and possessed by the inhabitants of said village as commons belonging to said village prior to and until the 20th day of December, 1803; that the premises sued for are within the said boundaries of said commons, and that at the time when Joseph C. Brown made the survey, purporting to be a survey of the commons of Carondelet in 1834, the inhabitants of Carondelet claimed before him on the ground, and pointed out to him on the ground the said line from the Sugar-loaf mound to the said corner of said common fields as the north line of the commons of said village; and that said Brown run said line, for and at the request of the said inhabitants, as the north line of said commons; and that said Brown fraudulently omitted to return to the surveyor general's office the said survey of said north line, and fraudulently returned an erroneous survey of another line as the northern line, nearly half a mile south of said Sugar-loaf mound—then the jury is instructed that the said survey of Brown of the commons of 1834, does not con-

clude or estop the plaintiff from recovering in this action."
The court gave the following instruction prayed by defen-
dant : " 1. All the right, title and interest of the United
States in and to the commons of the village of Carondelet
was vested in the inhabitants of said village by the acts of
Congress of June 13, 1812, and of January 27, 1831. The
United States surveys No. 3102 for Carondelet commons, and
No. 3125 for St. Louis commons are each and all of them
evidence of the extent and boundaries of the respective com-
mons, so confirmed and relinquished by the United States to
the said villages of St. Louis and Carondelet ; therefore, if
the land in controversy in this action is within the commons
of St. Louis as surveyed by the authority of the United
States, and not within the commons of Carondelet as sur-
veyed by the United States authorities, the plaintiff can not
recover."

The jury rendered a verdict in favor of defendant.

*B. A. & D. W. Hill*, for appellant.

I. The confirmations by the first section of the act of Con-
gress of June 13, 1812, were not subject to the condition of
survey. In this respect they are unlike the confirmations by
the first board and by the recorder of land titles, which were
of claims to be surveyed. Under such confirmations the title
did not pass until the survey. (Guitard v. Stoddard, 16
How. 508 ; Chouteau v. Eckart, 2 How. 344 ; West v. Coch-
ran, 17 How. 414 ; Mackay v. Dillon, 4 How. 445 ; Caronde-
let v. McPherson, 20 Mo. 193.)

II. The outboundary survey directed to be made in the
first section of the act of June 13, 1812, is not conclusive
against the claimant of a field lot outside of such survey.
(Milburn v. Hortiz, 23 Mo. 532 ; Tayon v. Hardman, 23 Mo.
539 ; Schultz v. Lindell, 24 Mo. 567.) The outboundary is
the only survey directed by the act of June 13, 1812 ; and if
it does not conclude the claimant of a field lot outside of such
survey, then no survey made under any subsequent act of

Congress can affect the plaintiff's right to recover. (Guitard v. Stoddard, 16 How. 509.)

III. Surveys of confirmations under the act of March 3, 1807, have only been held conclusive in cases where the grant had no definite or certain location. The distinction between confirmations under the act of 1807 and the act of 1812 was carefully drawn in the case of West v. Cochran, 17 How. 416. See also Standford v. Taylor, 18 How. 409, and cases above cited. The survey of the St. Louis common, including as it does the premises in controversy, can have no effect whatever. The survey for St. Louis of the land granted to Carondelet as common is a mere nullity. (Stoddard v. Chambers, 2 How. 318 ; Grignon's Lessees v. Astor, 2 How. 350 ; Strother v. Lucas, 12 Pet. 450.)

IV. There was no question of estoppel in this case. The court below refused to admit any evidence of the proceedings upon the survey of the Carondelet common. If there be any force in the question of estoppel, the court erred in excluding the evidence offered by plaintiff. The United States were not bound by Brown's survey at any time after September 24, 1839. Estoppels must be mutual unless they be by matter of record. The mere fact of survey by the United States does not create en estoppel against the plaintiff. (Carondelet v. McPherson, 20 Mo. ——.) The inhabitants must be shown to have accepted the survey as a correct one in order to be bound by it. From the record it appears that neither Carondelet or the United States have accepted Brown's survey. It appears to have been repudiated by both parties.

V. The commissioner of the General Land Office had power to disapprove the survey. (See 1 Land Laws, Senate ed.·; Acts of Congress, of May, 1785, p. 11, 12 ; of July 23, 1787, p. 24, 33, 34 ; of May 18, 1796, p. 50 ; see also Part 2d of Land Laws, Sen. ed. p. 64, 85, 98, 153, 198, 199, 220, 395, 728, 729, 730, 733, 735, 736, 738, 739, 740, 742, 743, 744, 747, 748, 758, 759, 760, 785, 794, 801, 802, 803, 804, 805, 806, 809, 810, 819, 824, 838, 835, 900, 905, 912, 908, 944, 948, 962, 960, 996 ; see also Acts of May, 1800, id. p. 71–78 ;

of March, 1804, p. 104, 110; of July 28, 1806, p. 152; of March 3, 1807, p. 154–7; of April 25, 1812, p. 211; of June 13, 1812, p. 217; of March 3, 1813, p. 232; of April 12, 1814, p. 243–4; of April 29, 1816, p. 278; of May 26, 1824, p. 398; of July 4, 1836, p. 552.) From all these acts of Congress, it will be manifest that the surveyor of Illinois and Missouri, after the act of 1816, was subject to the control of the President and the commissioner of the General Land Office, and that all the powers of the Department of State, of the Treasury, and of the War Department, over the public lands, were vested in the said commissioner by the act of April, 1812. By invariable custom, this power of control has been exercised over the surveyors, the registers, the recorders of land titles, and the receivers. The surveyor is an executive officer, and. is directly under the control of the President. The theory and practice of the government requires that this control should be exercised. For the sake of convenience, special officers have been created to aid the President in the performance of his executive duties in relation to the public lands. It would be destructive of all the checks and balances of the government to hold that the act of a surveyor was a finality not subject to revision by the President and the Land Department. This power of revision is recognized in almost every act of Congress, and has been exercised ever since the organization of the government. The system of surveys and the operations of the Land Department are based upon this immemorial custom. It has never been doubted until lately that this control over the surveyors existed. Public policy requires that this long-settled practice of the Land Department, recognized in so many instructions through every administration, should not now be disturbed or questioned.

VI. There is no privity between the plaintiff and the defendant, through which the defendant can claim the benefit of an estoppel. The plaintiff has done no act by which the defendant can claim the benefit of an estoppel. (Cottle v. Sydnor, 10 Mo. 767.) The inhabitants of Carondelet must

have had power to grant this land as common in order to pass it by estoppel. (Dugal v. Fryer, 3 Mo. 31.) The board of trustees of Carondelet had no power, in 1834, when Brown's survey was made, to pass the title to the land in controversy. No such power was vested in the board of trustees or in any body until the year 1851.

*Bay*, (city counsellor,) and *Todd*, for respondent.

1. The act of June 13, 1812, reserved the control of the designation of an outboundary line of the entire territory within which the grant of the act should operate. (Le Bois v. Brammel, 4 How. 464; Guitard v. Stoddard, 16 How. 494; West v. Cochran, 17 How. 403; Standford v. Taylor, 18 How. 409; Cabanné v. Lindell, 12 Mo. 184; 14 How. 514.)

II. If this proposition is not suffered to prevail, then it is insisted that the approved surveys, of particular classes of property confirmed by this act to claimants, for the purpose of defining their locations and of fixing the outboundary line, should be conclusive of their respective location.

III. As the right to run an outboundary was secured to the United States, and by consequence the right also to survey the locations of the kind of property embraced by the act of 1812, a survey under this act of the common of a Spanish town should be held conclusive of its location until another location should be shown of an official character by the Spanish or French authorities. (4 How. 464.)

IV. The record shows, by the evidence given and offered by plaintiff, that the common of Carondelet, without an authoritative survey, is of that vague and uncertain locality that makes it no property at all, in a court of justice, as against a grantee of the United States of land certainly defined for him by the United States. (16 How. 242.)

V. The survey of St. Louis common was made in 1832. St. Louis has governed, used and disposed of her common notoriously ever since according to this survey. Carondelet

has never attacked this survey of the St. Louis common before the United States authorities. (Carondelet v. McPherson, 20 Mo. 205.)

RICHARDSON, Judge, delivered the opinion of the court.

In the consideration of this case, it must be assumed that the plaintiff could have made good the order to impeach and invalidate the survey of 1834 of the Carondelet common; and the court, in excluding the evidence and giving the instruction which decided the case, must have held, either that the survey was binding though disapproved by the United States and rejected by the plaintiff, or that, admitting as proved every thing that was offered to be proved, the plaintiff had no standing in court without a survey, or that the opposing survey of the St. Louis common was conclusive on the rights of the plaintiff without a survey, or with one that did not include the *locus in quo*.

The case presents a conflict between the boundaries of the common of Carondelet as claimed by the plaintiff, and of the common of St. Louis as designated by a United States survey; and the questions to be decided are, first, whether the plaintiff can recover without a survey, and, secondly, whether the survey of the common of St. Louis is conclusive on Carondelet as to the land included within it. Both parties derive their respective titles from the act of Congress of the 13th of June, 1812, and these questions must be determined by the construction of that law, and the judicial decisions which have been made under it. In reference to private claims, at least, it has been so often decided by this court and the Supreme Court of the United States, in every instance in which the subject has been considered, that the act *proprio vigore* operated to confirm the "rights, titles and claims" to the property described in the first section, that it is no longer an open question; and the proposition is so well settled in so many cases, that the bare statement of it carries with it the familiarity and force of an axiomatic truth. (Soulard v. Clark, 19 Mo. 581.) The act was a complete divestiture of all the

title of the United States, and nothing being reserved by the government, nothing was required to be done by the confirmee. Mr. Justice Campbell observes, in Guitard v. Stoddard, 16 How. 510, that " the act of 1812 makes no requisition for a concession, survey, permission to settle, cultivate or possess, or of any location by a public authority, as the basis of the right, title and claim upon which its confirmatory provisions operate. No officer was appointed to survey or to locate any individual right. All the facts requisite to sustain the confirmation—what were village or town lots, outlots, common field lots or commons—what were conditions of inhabitation, cultivation or possession, to bring the claimant within the act—were referred to the judicial tribunals."

The act of May 26th, 1824, supplementary to the act of 1812, by the first section declared " that it shall be the duty of individual owners or claimants of town or village lots, outlots and common field lots, in, adjoining, or belonging to the several towns or villages" of St. Louis, Carondelet, &c., whose lots were confirmed by the act of 1812, to proceed within eighteen months thereafter to designate their lots by proving before the recorder the fact of inhabitation, cultivation or possession, and the boundaries and extent of each claim. As this act spoke in a tone of command, it was supposed by some persons that the United States had the right to impose on the claimants the duty of proving their claims before the recorder, and that the assertion of the authority implied that some power existed over the subject which had been reserved. But it was decided by this court that the act of 1812 was absolute, depending only on the fact of inhabitation, cultivation or possession prior to the 20th December, 1803; (Soulard v. Clark, 19 Mo. 582; City of St. Louis v. Torrey, 21 Mo. 243;) and the question was ably discussed and decided on like reasoning and in the same way by the Supreme Court of the United States, in Guitard v. Stoddard, 16 How. 494. The rights, titles and claims to commons were confirmed by the same section of the act that confirmed the titles to town lots, out-lots, &c.; and it will be observed that the first sec-

tion of the act of 1824 does not mention the commons or include them within any of its requirements ; and if the claimant of a town or common field lot can recover without a survey, and in the face of a law that directs him to prove his claim and the boundaries and extent of it before the recorder, we can not appreciate the force of the reason that forbids the claimants of common from recovering without a survey.

By the first section of the act of January 27, 1831, the United States relinquished to the inhabitants of the towns or villages of St. Louis, Carondelet, &c., all the right, title and interest of the United States in and to the town or village lots, out-lots, common field lots and commons, in, adjoining and belonging to the said towns or villages, confirmed to them respectively by the first section of the act of 1812, to be held by the inhabitants of the said towns and villages in full property, according to their several rights therein. The second section relinquishes the right, title and interest of the United States to the town lots, &c., reserved for the support of schools by the second section of the act of 1812. The object of the second section of this act is readily understood, for it was necessary to divest the United States of the title to property, which had never before passed, but had only been reserved. But the object of the first section is not perceived, for there was nothing on which it could operate, and there was no interest remaining in the United States to be relinquished if the whole passed in 1812. No one pretends that the act was necessary to perfect any right to private claimants, and no argument can be drawn from it to prove that the rights, titles and claims to commons were not as complete by the act of 1812 as the rights and titles of claimants to town lots, &c.

The Supreme Court of the United States, in Le Bois v. Brammel, 4 How. 457, speaking of the act of 1812, in reference to the St. Louis commons, observes : " That this was a general confirmation of the common to the town as a community, no one has ever doubted, so far as the confirmation operated on the lands of the United States." And the learned Judge who delivered the opinion of this court in Caron-

delet v. McPherson, 20 Mo. 201, remarked that, "according
to the decisions of the Supreme court of the United States,
the act of 1812 confirmed the lots to individuals, and the
commons to the towns, without regard to the question whether
there had or had not been a previous survey, and the boun-
daries of the claims thus confirmed were left open for proof
in any litigation that might arise."

But the first proposition we are considering was directly
before this court, and decided in the case of Carondelet v.
McPherson.   The case turned on the propriety of an instruc-
tion which asserted that the claim of the plaintiff could not
be sustained without a survey which included the property in
dispute.   The instruction was declared erroneous, and it was
held that the plaintiff's title to common might be established,
without a survey, by proof of user prior to December 20,
1803.   The only difference between the two cases is, that in
this case both parties claimed under the same act, and the
plaintiff was met by an approved and accepted survey of the
St. Louis common, and this leads us to consider the second
proposition.

The United States surveys of the commons of St. Louis and
Carondelet are no doubt *prima facie* evidence of the extent
and boundaries of the respective commons of said towns, and,
when approved by the United States and accepted by the
parties for whom they were made, were conclusive on the
United States and the towns respectively, and all persons
claiming subsequently to the grant under them or either of
them.   When a claim is not confirmed according to ascer-
tained boundaries, but the confirmation is coupled with the
condition that the land shall be surveyed, the confirmee can
not controvert the survey that locates the claim.   (Standford
v. Taylor, 18 How. 412.)   But it is settled that confirma-
tions under the act of 1812 were legislative grants without
any conditions annexed, and that the act was operative to
pass the title without any thing further being done by the
United States.   If so, neither the government, nor any de-
partment, nor officer under it, could impair the grant by an

City of Carondelet v. City of St. Louis.

improper survey or otherwise. When, however, the survey of the St. Louis common was made and approved by the United States and accepted by the defendant, it was conclusive on the parties to it, for, as they agreed to it, they are bound by by it ; but other claimants to land within its boundaries, who were not parties to it, were not concluded, and could controvert it so far as their claims were affected by it. (Menard v. Massey, 8 How. 314.) In the City of St. Louis v. Toney, 21 Mo. 243, a private claimant under the act of 1812, whose land was covered by the survey of the commons, was allowed to dispute its correctness, and to recover against the commons' title, without having complied with the act of 1824, upon proof of inhabitation and cultivation prior to December 20th, 1803. So also in Vasquez v. Ewing, 24 Mo. 31, this court decided that though the Supreme Court of the United States, in Le Bois v. Brammel, had established the doctrine that the approved survey of the St. Louis common, confirmed by the act of 1812, was equivalent to a patent, and that the title was as perfect from the government as could be obtained, and could not be assailed by the government nor any one claiming under it subsequently to the confirmation of the common, yet a private claimant within the boundaries of the survey, and asserting title under the same act of confirmation, might prevail against a person claiming under the city, upon actual proof of such facts as would bring him within terms of the first section of the act of 1812. The first section of the act that confirmed the " rights, titles and claims to town or village lots, and lots and common field lots," in the same breath and in the same words confirmed the titles and claims to the " commons in, adjoining and belonging to the several towns or villages" named in it. No distinction is made between the claimants of the different kinds of property designated in the act; and if the claimants of town village lots, out-lots, or common field lots can recover or without surveys, and are not concluded by surveys made for other claimants, no reason is perceived why a different rule should be applied to the claimants of common. If one can

maintain ejectment without a survey, the other can; and if one is not concluded by a survey to which he has not assented, and to which he was not a party, the other ought not to be. Both are vitalized by the same power and are subject to the same conditions. The confirmation to each was a grant by legislation which carried the fee, and was superior to the dignity of a patent (Grignon's Lessee v. Astor, 2 How. 344); and to the extent of impairing the rights which the act conferred the power of the government was exhausted, and they were sacred from the improper interference of the highest executive officer, the head of a department, or any subordinate officer or agent; "but the boundaries of the claims thus confirmed were designedly, as we suppose, left open to the settlement of the respective claimants by litigation in the courts of justice." (Mackey v. Dillon, 4 How. 446.)

In our opinion the plaintiff might recover without a survey; was not concluded by the defendant's survey, nor by the survey of 1834, if it was not approved by the United States or assented to by the plaintiff, as showing the extent and boundaries of the Carondelet common. If, however, the survey of 1834 was approved, it would be *prima facie* evidence of the true location and boundaries of the Carondelet common, and the plaintiff could not recover without showing that it was incorrect and had never been recognized or accepted. No formal act is necessary to constitute an acceptance, but it may be inferred from a variety of acts and circumstances; and though the acts of the party going to show that the survey had been accepted must be proven as facts to the jury, it will be the province of the court to declare, as a matter of law, the legal effect of particular acts bearing on the question. Judge Napton concurring, the judgment will be reversed, and the cause remanded.

SCOTT, Judge. As only part of the claim of Carondelet for commons is presented by this record as it appears, I am not willing to express an opinion as to whether Carondelet can, on her bare confirmation alone, maintain an ejectment. There

is no doubt the act of 1812 conferred title, but to what lands is a matter for judicial determination. It is for the courts to say whether a claim, although it has been confirmed, has that degree of definiteness which entitles it to be submitted to the jury. As the case now stands, I am not prepared to say that Carondelet would not be entitled to recover.