# CASES DETERMINED

IN THE

# ST. LOUIS COURT OF APPEALS.

## MARCH TERM, 1879.

---

CHARLES GIBSON, Plaintiff in Error, *v.* CHARLES P. CHOU-
TEAU ET AL., Defendants in Error.

### March 11, 1879.

1. A survey of a confirmation made by a deputy-surveyor has no official validity until approved by the surveyor-general of the proper district.

2. In a possessory action, allegations as to title are mere surplusage and do not make the question of title *res adjudicata.*

3. Where a judgment in ejectment was entered in the Supreme Court in favor of the plaintiff, upon condition that plaintiff enter a *remittitur* for certain interfering surveys specifically described, such a *remittitur* is not a *retraxit,* and is not a bar to another suit.

4. Where the Supreme Court has passed upon equities pleaded by the defendant, and found adversely to him, he is concluded by the judgment, and they cannot be sustained when again pleaded by him as a defence to an action of ejectment for the same land.

5. Inferior tribunals are bound by the conclusions of the Supreme Court, and cannot treat them as *dicta,* on the theory that the questions determined were not properly raised by the record, and were not necessary to the determination of the case.

Error to St. Louis Circuit Court.

*Reversed and remanded.*

Charles Gibson, *pro se.*

Thomas T. Gantt and Glover & Shepley, for defendants in error.

Lewis, P. J., delivered the opinion of the court.

This controversy has undergone various mutations and migrations, through different forms and different forums, during the past sixteen years. In September, 1862, the plaintiff, Charles Gibson, commenced a suit in the St. Louis Land Court against the defendant Charles P. Chouteau, and others, to recover possession of a tract of sixty-four acres, which included the twenty-four acres of land sued for in the present proceeding. Gibson obtained judgment, from which Chouteau appealed to the Supreme Court. In 1866, the Supreme Court affirmed the judgment of the Land Court; but afterwards sustained the defendants' motion for a rehearing, chiefly on the defence of limitation. Upon the reargument, in 1867, the court adhered to its former views as to all the defences, but reversed the judgment by reason of the Statute of Limitations. 39 Mo. 536. The case was then taken by Gibson to the Supreme Court of the United States. That court found in the record no sufficient showing that the Missouri tribunal had determined the cause upon any question of Federal jurisprudence, and dismissed the appeal. 8 Wall. 316. Subsequently, at the October term, 1869, Gibson moved in the Supreme Court of Missouri for a correction of its records so that the grounds of its decision against him might clearly appear. The motion was sustained, and entries *nunc pro tunc* were made, whereby it was shown that the decision was based exclusively on the Statute of Limitations as an effectual defence, notwithstanding the fact that the United States patent under which the plaintiff claimed was issued within ten years before the commencement of the suit. 45 Mo. 171. The cause was

again taken to the Federal Supreme Court, where the Missouri judgment was reversed on the ground that no limitation law could operate against a title while it yet remained in the government. 13 Wall. 102. Afterwards, in the Missouri Supreme Court at the March term, 1872, Gibson moved for a final judgment in his favor. The motion was sustained, with a proviso or condition that Gibson should enter a *remittitur* as to certain interfering surveys which covered part of the land in dispute. 50 Mo. 85. These surveys were specifically described in the record-entry of the judgment. The *remittitur* was entered accordingly. The present suit is for land covered by the interfering surveys. The judgment below was for the defendants.

It does not seem to be claimed for the defendants that the plaintiff is barred in this proceeding by the record of his *remittitur*. Such a claim, indeed, could hardly be reconciled with the defence on which they chiefly rely. They revive the equitable defences unsuccessfully urged in the former suit, and insist that as that was only a possessory action, as well as for other reasons, there is no *res adjudicata* in the premises. The plaintiff, on the other hand, contends that all the equitable defences are barred by the former adjudication, while he holds that the *remittitur* only places him, as to the lands affected by it, where he would have been if they had never been involved in the suit. If the defendants are right, the subject-matter of the *remittitur* must be, no less than the other matters in dispute, open to further litigation. It may not follow, however, that the plaintiff's claim of *res adjudicata* as to all questions of title or ownership, if sustained, will operate a bar against any later assertion by him of title in the lands covered by the *remittitur*. If we treat the judgment as conclusive, there may seem to be a repugnancy in permitting the plaintiff to sue a second time for what he has surrendered as a condition of the determination in his favor. A *retraxit* would, of course, conclude him. In that form of entry, " the plain-

tiff voluntarily abandons his cause, and goes further : he admits that he has no cause of action." *Pinner* v. *Edwards*, 6 Rand. 675. But the entry in the present case makes no such admission. It amounts simply to " an agreement not to proceed farther in that suit," as to the particular cause of action. Such an entry is no bar against another suit. *Minor* v. *Bank*, 1 Pet. 74.

The recovery in the former suit was based upon a United States patent for survey No. 2498, containing six hundred and forty acres, including the sixty-four acres sued for, which was issued June 10, 1862, to Mary MacRee, " as assignee in right of James Y. O'Carroll, in virtue of deraignment of title." The patent contained a list of interfering claims, numbered from one to seven, inclusive, followed by a reservation in these words : " Hereby expressly excepting and excluding from the transfer by these presents such valid rights as may exist in virtue of the claims particularly designated under the 1st, 2d, 3d, 4th, 5th, and 6th heads in the foregoing, and further saving and excepting from the transfer by these presents of any other valid adverse claims, should such exist, to any part of the land embraced in the aforesaid survey number 2498."

The seventh in the list of interfering claims is thus described : " 7th. Survey No. 3309, Calvé — a lot of 2 by 40 arpens in the Cul de Sac Prairie Common Field. There is no evidence of this claim being confirmed." The patent proceeds : " The foregoing interferences, excluding that with survey No. 3309, contain 379.72 acres. To the residue of survey No. 2498, containing actually 291.45 acres, so far as the records of this office show, there is no valid claim." This language appears to have been copied from a public record, and adopted into the patent. It seems distinctly to exclude the Calvé survey from the reservation, and to incorporate it with the " residue " of survey 2498, against which " there is no valid claim." This Calvé survey is nevertheless included among the interferences covered by

the plaintiff's *remittitur*, and embraces part of the land in controversy in the present suit.

A good deal of testimony tended to show that the Calvé survey No. 3309 was without validity for any purpose. The original concession to Joseph Calvé, dated April 30, 1768, was for two by forty arpens in Grand Prairie. The minutes of Recorder Bates, under date December 31, 1813, locate the claim in " Big Prairie Field," which was but another name for the Grand Prairie. The memorandum of confirmation by the same officer, made prior to July 1, 1814, notes the claim thus: " 80 arpens, to be surveyed, F. 153, Field of St. Louis, B. Prairie." That survey No. 3309 could not be the true survey of this confirmation was evidenced by the following facts: It located the land in the Cul de Sac Common Field, but the survey was never approved. On the contrary, as appears by a letter from the commissioner of the General Land-Office, dated April 18, 1874, an application for its approval by that officer was refused. He states, from evidence furnished by official papers, that " survey No. 3309 has never been approved ; but, on the contrary, it was considered to be null and void for want of confirmation." He adds, in effect, that this opinion seems to have been acquiesced in and adopted by the General Land-Office in the issuing of the MacRee patent for survey No. 2498. He also refers to another survey, No. 1583, of the Calvé confirmation, which correctly located the land in the Grand Prairie Common Field, and which was regularly approved by the proper authority. A duly certified plat and description of this survey, showing that it was approved by the surveyor-general, May 15, 1845, was introduced in testimony by the plaintiff.

It thus appears that there was a strong array of testimony tending to show that the Calvé survey No. 3309 was not properly included in the plaintiff's *remittitur*, under either the terms of the patent or those of the opinion of the Supreme Court. We have already intimated, however, that,

in our view, the plaintiff is not, by reason of the *remittitur*, precluded from maintaining in this proceeding his original right, if any he had, in the lands remitted. But, as to all the designated interferences, other than the Calvé survey, the patent itself is conclusively against him.

Plaintiff prayed the court, sitting as a jury, to declare the law to be that the Calvé claim was not excepted from the grant by the patent, and that if the decision of the commissioner rejecting the survey No. 3309 was genuine, the title shown by the plaintiff to the same premises was superior to any shown by the defendant thereto. Also, that the plaintiff's *remittitur* in the former action was no bar to this, if the land remitted was easily divisible from the land recovered. Also, that the location by a United States survey of the Calvé confirmation in the Grand Prairie Common Field was a bar to another survey of the same confirmation in a different place. These declarations of law were refused, and it was declared for the defendants, in effect, that there was *prima facie* evidence of the validity of the Calvé survey No. 3309, as of a confirmation by the act of June 13, 1812 ; and that, there being no countervailing evidence, the plaintiff could not recover any land within said survey No. 3309.

These rulings were clearly erroneous. It has never been. supposed that a survey made by a deputy-surveyor had any authoritative or official validity until approved by the surveyor-general of the proper district. On the contrary, the approval of a survey either by that officer or by the commissioner of the General Land-Office, on appeal or otherwise, has always been treated as an elementary condition necessary to its efficacy, even as *prima facie* evidence of a true location. *Carondelet* v. *St. Louis*, 25 Mo. 464 ; *Menard* v. *Massey*, 8 How. 314 ; *Guitard* v. *Stoddard*, 16 How. 512 ; *Dent* v. *Sigerson*, 29 Mo. 489 ; *McGill* v. *Somers*, 15 Mo. 80. A very able and otherwise accurate brief before us states that the survey No. 3309 was ap-

proved in 1856.   We search the record in vain for evidence of such approval.   The surveyor-general, under date October 8, 1856, certifies that the accompanying description of the survey is " correctly copied from the original field-notes returned by Joseph C. Brown," on file in his office.   No word of approval of the survey appears here or elsewhere. We have already shown that, by the very terms of the Mac-Ree patent, there was no valid claim to the land embraced in that survey, which could operate to diminish the grant.

James Y. O 'Carroll was the owner of six hundred and forty acres of land in New Madrid County, which, after it had passed out of his hands, was injured by earthquakes in the year 1811.   A certificate for relocation was issued by the United States recorder, in November, 1815.   On June 16, 1818, Christian Wilt, having by a succession of transfers become owner of the certificate, procured its location on land in St. Louis County, which was duly surveyed and designated as survey 2498, containing six hundred and forty acres.   Wilt died, and Joseph Hertzog, his surviving partner in business, appears to have held the New Madrid claim as belonging to the assets of the late firm.   He executed a deed of trust to Robert Wash, trustee, who, on October 27, 1824, reciting in general terms that his conveyance was in pursuance of the trust, conveyed sixty-four acres off the western end of the tract to Pierre Chouteau.   On May 17, 1825, the entire tract was conveyed to Henry Clay by sheriff's deed, under a judgment against Hertzog, surviving partner, etc.   In March, 1832, a decree was rendered vesting in Henry Clay all the title remaining in the heirs of Wilt, deceased, and in Robert Wash, trustee, to the tract of six hundred and forty acres.   In the same year, Mr. Clay agreed to convey the land to William MacRee in consideration of $500, which MacRee paid him.   MacRee died, leaving three heirs, two of whom in 1836 released, with covenants for further assurance, to Samuel MacRee, the third heir; and on October 11, 1839, Mr. Clay, reciting

his agreement with William MacRee, conveyed the tract to the three heirs. By a deed dated August 30, 1838, acknowledged October 31, 1839, and recorded November 8, 1839, Samuel MacRee " bargained, sold, released, quitclaimed, and conveyed " to Pierre Chouteau, Jr., the sixtyfour acres which had been conveyed to the same grantee by Robert Wash, trustee. In 1844, Samuel MacRee filed a bill in equity, tracing the course of the inchoate title from Christian Wilt through Joseph Hertzog and Henry Clay to himself, and praying a decree against the heirs of George W. Wilt, who was the only son and heir of Christian Wilt. In 1848, a final decree was rendered, vesting in Samuel MacRee all the title to the New Madrid location of which Christian Wilt had died seized. MacRee had previously, in 1845, conveyed to Lucas and Hunt a part of the tract, bounding it by the sixty-fouracre parcel which he had sold to Pierre Chouteau, Jr. Samuel MacRee died in 1849, leaving a last will, whereby his property was bequeathed to Mary MacRee, his wife.

The survey No. 2498 was duly returned to the Land-Office in 1841, and a patent certificate, No. 447, was thereupon issued to James Y. O'Carroll, or his legal representatives. On June 10, 1862, the patent already described was issued to Mary MacRee, who, on August 8, 1862, conveyed to the plaintiff herein the sixty-four-acre tract before mentioned. Part of this, as already stated, is the land here in controversy. The defendants have succeeded to whatever rights were acquired by Pierre Chouteau, Jr.

Upon this state of facts, it is claimed for the defendants that they are equitable owners of the sixty-four acres, as to which the patent to Mary MacRee gave her no more than the legal title encumbered with a trust for Pierre Chouteau, Jr., or those claiming under him. It is not disputed that Gibson, when he took the deed from Mrs. MacRee, had full notice of the antecedent conveyances and transfers ; so that he is bound by whatever trust attached to his grantor. To

this claim the plaintiff responds that the whole subject-matter is *res adjudicata;* that the same claim of equitable rights was involved in the former suit between the same parties, and was therein finally decided-upon against the defendants.

In the suit of *Gibson* v. *Chouteau,* commenced in September, 1862, the petition was, in general form, adapted to an action of ejectment; but it contained a statement to the effect that Mary MacRee was, prior to August 20, 1862, invested by the United States with the title of the premises sued for, and, being so invested with the title thereto, conveyed the same to the plaintiff. It is now argued by the plaintiff that these allegations made the proceeding something more than a mere possessory action, and that, under our code of practice, the element of title was properly introduced as a distinct feature of the pleadings; so that the ultimate judgment in plaintiff's favor did not, as in case of an ordinary ejectment, leave the door open for subsequent litigation between the same parties of possessory rights dependent upon title in the same land. The error of this assumption is apparent when we consider that no decree of title was blended with the judgment for possession. That case, at least, was not an action of ejectment maintained under the guise of a bill in chancery.

The distinction between, and the necessity for keeping separate, the powers exercised by a court of equity and those of a court of law have been uniformly recognized in this State, notwithstanding the Code. There was in the petition under consideration no prayer for a decree of title. Judgment for possession only, with damages, etc., was demanded. The action was purely possessory, and the allegations about title were surplusage.

The answer in that suit put in issue the allegation of the petition, set up the defence of limitation, and charged that the right, title, and interest which the plaintiff pretended to have, and any deed which he might produce in support thereof, were acquired by plaintiff as agent or attorney for

defendant Chouteau, and were fraudulently made to the
plaintiff in violation of the defendants' rights. Wherefore,
no title could vest thereby in the plaintiff to the prejudice
of the defendants. It did not set forth any specific equi-
table claim or defence arising out of the facts above detailed
in our history of the title. The plaintiff's reply put in issue
the affirmative allegations in the answer.

Under the pleadings thus framed, testimony was introduced
showing every event in the transmission of the O'Carroll
claim, including the various suits and decrees, with the sev-
eral transfers and inheritances, from its inception to the
commencement of the suit. When the case reached the
Supreme Court, that tribunal reviewed all the testimony,
and considered especially the equities claimed by the defend-
ants in connection with the conveyances to Pierre Chouteau,
Jr., prior to the issuing of the patent. It held, as control-
ling propositions, that the deed from Samuel MacRee to
Chouteau, being nothing more than a quitclaim, had no
operation to carry an after-acquired title in the grantor;
that at the date of that deed Samuel MacRee had nothing
to convey, and that his first acquisition of the inchoate equi-
table title, which afterwards ripened into a legal title by
patent to his devisee, was in the judicial decree of 1848,
whereby he was invested with all the title whereof Christian
Wilt had died seized. If this be the law of the case, it is
manifest that the defendants had no standing in a court of
equity, and have none now.

But the defendants now ask us to review these rulings of
the Supreme Court, or rather to consider *de novo* the ques-
tions settled by them, because, among other reasons, they
did not properly arise upon the record in the former case.
It is insisted that in order to ascertain what questions were
really before the Supreme Court, we must scrutinize the
record as it left the court below. From this it is to be
inferred, that if we find the appellate tribunal travelling
out of that record to reach its conclusions, we are authorized

to treat such conclusions as mere *dicta*, and not as the binding utterances of judicial authority.   Hence we are favored with arguments of unquestionable ability against the soundness of the reasoning of the Supreme Court, and its results. We are shown that the judicial decree rendered in 1848 vested no new title whatever in Samuel MacRee, but, like all other judgments, was a mere ascertainment of his rights as they previously existed ; that if there had emanated from the United States a sufficiency of the insignia of equitable ownership to found thereon a solemn judicial declaration of such ownership in Samuel MacRee, then it must have so emanated prior to the decree ; and as nothing had passed from the United States to MacRee since the date of his deed to Chouteau, the equitable title must have existed in him as fully when he delivered that deed as it ever did afterwards ; that the only event of any sort affecting the land, between the execution of MacRee's deed and the rendition of the decree, was the return of the survey in 1841 ; that this only perfected the location, which location was recited in MacRee's deed as having been already perfected ; wherefore, MacRee, and all claiming under him, were estopped to deny the fact of a perfect location at the date of the deed.   The return of the survey was therefore immaterial, except as it might enure to the benefit of MacRee's grantee.   From all which it follows that MacRee's quitclaim to Chouteau conveyed precisely the same equitable title which the decree ascertained to be in him, and which he afterwards undertook to bestow upon Mrs. Mary MacRee, in a devise which he had no power to make.

This may hardly claim to be even a faint outline of the leading propositions maintained by the defendants' counsel with an acuteness of analysis and a copiousness of illustration which, considered upon their intrinsic merits alone, might impress us as being exhaustive, if not unanswerable.   But the question remains whether this court is at liberty to

yield to any such impressions, in view of what has been said by its superiors in judicial authority.

It is an ancient maxim, that "He who knoweth not the reason of the law, knoweth not the law." It is said upon high authority that the decisions of the most exalted tribunals carry no weight with enlightened mankind, except as they are supported by sound reason. The highest courts known to our State and Federal Constitutions are required by law to deliver their adjudications in written opinions, which means that the decision itself shall not be more patent than the reasons which support it. These are, in moral effect at least, its charter of authority. The rule yields nothing to insubordination against the judicial mandate, yet it invites criticism from every source upon the logic which leads to the decree. Nowhere in our institutions can the popular mind rest upon any stronger assurance of liberty perpetuated under a government of law. It may therefore be a duty, no less than a privilege, for appellate courts of every grade to declare their views, whether concurrent or otherwise, upon the reasoning of their superiors, while yet conforming to the conclusions reached by the higher authority. In this way an additional contribution may sometimes be made to those exact processes of logic which will lead at last to the true result. But in the present case, were anything to be hoped for from a review of former decisions, we could add nothing to the thorough presentations before us in the briefs on file.

It may be admitted that, considering the form of the pleadings in the former suit, there is no technical *res adjudicata* to obstruct an examination into the merits of the equitable defences in the present case. It may be that not a single fact then put in issue need be inquired into upon such an examination. But it is none the less true that every court is bound by the legal conclusions formally announced by its direct superior in appellate authority. Our

Supreme Court found, and in effect declared, as a matter of law, that the equities which the defendants here plead were a legitimate subject of judicial inquiry upon the record then before them. We are not at liberty to dispute it. According to this ruling, we have now before us literally the case whose decision by the Supreme Court is reported in 39 Mo. 536. This decision was by the Supreme Court of the United States considered so far conclusive against the claims here introduced in defence, that it was declared that the defendants were strangers to the party who initiated proceedings for the land, " and to his equitable claim, or equitable title, as it is termed, not connecting themselves with it by any valid transfer from the original or any subsequent holder." 13 Wall. —. It would be unfair to assume that this conclusion of the Federal Supreme Court was founded upon its own estimate of the defendants' relations with the land. The tenor of the whole opinion shows that in this particular the court simply yielded to the exclusive jurisdiction of the Supreme Court of Missouri to decide upon those matters, and therefore adopted the effect of its decision in its application to the questions of Federal judicial cognizance. It cannot be expected that this court will be slower than the Supreme Court of the United States to recognize a controlling authority, as it lawfully resides in the Supreme Court of Missouri.

For these reasons, we cannot sustain the equitable defences here set up against the plaintiff's recovery of so much of the sixty-four-acre tract as is not affected by valid interferences. For error in the instructions concerning the Calvé survey, the judgment is reversed and the cause remanded. All the judges concur.