THE CITY OF CARONDELET, Appellant, *vs.* McPHERSON, Respondent.

1. The title of Carondelet to common, under the act of June 13, 1812, may be established without a survey, by proof of *user* prior to December 20, 1803.
2. As to the power in the general land office to set aside an approved survey made prior to July 4, 1836, and within what time it must be exercised, if it exists.

City of Carondelet *v.* McPherson.

3. If a town, through the proper authorities, consents to, accepts and acts upon a survey of its common as correct, it will be estopped from afterwards claiming, as common, land outside of the survey, against a party having acquired a title to it upon the faith of the correctness of the survey.

*Appeal from St. Louis Court of Common Pleas.*

This was an action brought by the city of Carondelet in 1852, for the possession of a tract of land bounded south by the northern boundary of the city of Carondelet, as incorporated in 1851, north by the St. Louis common, as surveyed, east by the Mississippi river, and west by the Carondelet common fields. The plaintiff claimed the land as a part of the common confirmed to the inhabitants of Carondelet by the act of congress of June 13, 1812, although it was not within any survey of the common. The defendant claimed under a patent from the state of Missouri, dated February 27, 1850, issued in pursuance of an act of assembly. (Sess. Acts, 1849, p. 64.) The land was located in the manner pointed out by said act, as a part of the 500,000 acres granted to the state by an act of congress approved September 4, 1841. The substance of the oral and documentary evidence offered by the respective parties at the trial is stated in the opinion of the court. Under an instruction, which is also set out in the opinion, there was a judgment for the defendant below, from which the plaintiff appealed. The cause was argued in this court by Mr. Casselberry, for appellant, and Mr. Todd and Mr. McPherson, for respondent.

Mr. *Casselberry* made the following points, among others :
1. As to the definition of common in the Spanish law he cited 1 Moreau & Carleton's Partidas, p. 328. *Chouteau* v. *Eckhart*, 2 Howard, 373. 2 White's Recop. p. 47, 100, 118.
2. The act of June 13, 1812, did not require that the common should be inhabited, possessed, cultivated or *used* as common. If it was *claimed* as such by the people interested, and recognized as such by the existing government, to be used at any future period, when necessity or convenience required, this is all the law of 1812 required. 3. The instruction given by the

court, assuming that a survey by the United States is necessary in order to vest a complete title in the plaintiff, is directly in opposition to the decision of the Supreme Court of the United States in the case of *Chouteau* v. *Eckhart*, 2 Howard, 344. The only object of a survey of a confirmed claim is to locate the land where the boundaries are uncertain; but when the boundaries can be ascertained, a survey is unnecessary. (*Smith* v. *United States*, 10 Peters, 331.   *United States* v. *Aredondo*, 13 Peters, 134.) In this case, the boundaries of the land are very definite.   It is bounded on the west by the common field, on the south by the town, on the east by the river, and on the north by a line running west from the Sugar Loaf. This line is clear and definite, as shown on the plats and by the evidence.   This court has often decided that no survey is necessary in the case of a town or village lot or common field lot.   Mere verbal proof of a confirmation is sufficient.   The common was granted by the same law and the same section, and why require a survey?   4. The survey of Brown, as shown on the plat itself, does not include all that is " claimed," as required by the act of 1824.   All of the common north of the town should have been surveyed separately from that south of the town.   5. There is no estoppel against the plaintiff.   To pass an estate by estoppel, the party must have power to pass it by a direct conveyance.   (*Dugal* v. *Fryer*, 3 Mo. Rep. 31.)   Until the city of Carondelet was chartered in 1851, the corporate authorities had no power to make any other disposition of the common than to lease it; and as they had no power to convey in fee simple, they could do no act that would operate as an estoppel, any further than in relation to leases; and as the defendant denies that he is tenant, he cannot set up an estoppel of any kind.   The estoppel of a deed only extends to parties and privies thereto, and not to strangers.   The defendant would be a stranger to any estoppel of the kind insisted on. (*Cottle* v. *Snyder*, 10 Mo. Rep. 763.)

Mr. *Todd*, for respondent, relied upon the following points :
I. Upon the law and evidence, the instruction given by the

court below in this case was correct. 1. The appellant has no title to commons, except by virtue of the act of congress of June 13, 1812. 2. Under that act, she has no title to commons, unless supported by a *rightful* claim, *or* by a valid United States' survey designating them and severing them from the public domain. 3. She can have no *rightful* claim to commons except by a concession, or grant or permission from the Spanish government, and of this her highest and sole admissible evidence is the reply of governor Trudeau to the petition of Gamache, and Soulard's official survey, by which her common is located south of her. To this she is limited by her own constituents and original founders, in their acts of notice of their claim to the recorder of land titles, and the subsequent presentment of their claim before the old board of commissioners. Against this evidence, parol testimony is inadmissible. 4. No United States survey of the common embraces the land sued for. II. The survey of Rector, and of Brown as a retracing thereof, is conclusive upon the plaintiff as to the location of her commons. (See acts of congress providing and regulating surveys, from 1785 to 1836.) III. At least, the survey is conclusive as against the United States and Carondelet, in favor of third persons deriving title from the United States outside of such survey, after the approval thereof by the surveyor general, and before its legal cancellation, if subject to cancellation at all, and in fact cancelled. (3 Howard (U. S.) 773, 787, and cases cited therein. 8 id. 313–14. 5 La. Ann. Rep. 510, and cases there cited. 3 Peters, 96.) IV. The commons confirmed to Carondelet by the act of June 13, 1812, are to be presumed to embrace her claim therefor in location and extent filed by her before the old board of commissioners, and no other, in the absence of further legal action in her behalf by the United States. V. In the absence of the evidence of the plaintiff's claim for commons, as filed before the old board, and of duly authorized surveys, the plaintiff has no title or property to commons of any standing in a court of justice, under the laws of this state. The principle of this

proposition is founded upon the vagueness and uncertainty of both the location and of the quantity of the commons. VI. The record shows an estoppel upon Carondelet from claiming any land between the south line of the St. Louis common and the north line of Brown's survey of her own. As to the objection of a want of privity, it may be answered that defendant occupies the position of the United States, between whom and plaintiff there was a direct privity. As to the objection that the inhabitants of Carondelet had no incorporation competent to be estopped until 1851, it may be answered, 1. That they had from 1825. (Acts of 1825, p. 211, 212, sec. 1.) 2. If not, still the inhabitants could be estopped in their collective capacity. They are to be regarded as a *quasi* corporation, a political or municipal body, a town or village ; not as so many separate and independent individuals, holding their commons as tenants in common or joint tenants. (*Bird* v. *Montgomery*, 6 Mo. Rep. 523.)

GAMBLE, Judge, delivered the opinion of the court.

The plaintiff claims the land in controversy as a part of the commons of the village of Carondelet, confirmed by act of congress of June 13th, 1812. At the trial, no grant of commons was produced by the plaintiff, and no survey, Spanish or American. The reliance was upon the proof by witnesses, that, at a period before the change of government, the authorities of the village of St. Louis and Carondelet met together to mark the line between their respective commons, and that this meeting was by the direction, or with the knowledge and approbation of the lieutenant governor, and was attended by the surveyor general ; that, at the meeting, it was agreed to run the line from a noted mound called the " Sugar Loaf," on the bluff of the Mississippi river, to the line of the common fields of Carondelet, or, as some of the witnesses say, to the north-east corner of those fields ; that the line was accordingly run by the surveyor general and cut out and marked by monuments ; that

a fence was made upon that line, and the inhabitants of the two villages used the land on the different sides as their respective commons. The claim of the plaintiff was entirely rested upon this parol evidence.

On the part of the defence, documentary evidence was given of the claim of Carondelet to commons, as exhibited before the first board of commissioners. The notice of the claim was in these words : " Take notice, that we, the inhabitants and settlers of the village of Vide Poche, in the district of St. Louis, claim, title to 6,000 arpens of land, situate adjoining said village, by virtue of a concession from Don Zenon Trudeau, lieutenant governor of Upper Louisiana, dated the 7th December, 1796." This notice was addressed to the recorder of land titles, and was accompanied with the documents which are set out in the case of *Dent* v. *Bingham,* 8 Mo. Rep. 585. It may be necessary to say that there are no boundaries given either in the supposed grant, or in any survey filed with the claim, which apply to land north of the village. The document which is called a grant, is simply a refusal of the lieutenant governor to grant to an individual certain land he applied for, upon the ground that the land demanded was within the limits of land reserved for the purpose of furnishing wood necessary for the use of the village of Carondelet, and declaring that no other concession could be granted in the direction of a line taken from the end of the lands of the village, and running parallel with the Mississippi one hundred and fifty arpens further down said river. The defendant gave in evidence two surveys under the authority of the United States, one made in 1817, and the other in 1834, both professing to be surveys of the common of Carondelet, neither of which included the land now in controversy. The second was but a retracing of the lines of the first survey. The plaintiff, when giving rebutting evidence, produced a decision of the Secretary of the Interior, made in January, 1853, which was probably designed to set aside the surveys of the common, although it does not explicitly declare such purpose. The defendant gave evidence to show

that the corporate authorities of Carondelet had always recognized the survey made in 1834 as the correct survey of the common ; had divided the property contained within it into lots, and disposed of the same ; had, in different actions at law involving the title to the common, relied upon and used that survey as a correct survey of the claim, and, in other modes, had acted upon it as a satisfactory survey.

The Court of Common Pleas, at the trial of the case, gave a single instruction, which, under the evidence, was a denial of the plaintiff's right to recover. It is in these words : " If the premises sued for are north of the town or village of Carondelet, as the said town or village existed up to the 13th June, 1812, and said premises are not included within any United States survey of the common of Carondelet, or of the out-boundary of said town or village, officially run so as to include the town or village and out-lots, common field lots, and common of said town or village, then the jury should find for the defendant." There was no disputing the fact that the property was north of the village, and there certainly was no survey in evidence, which was made under the authority of the United States and included the premises in controversy.

1. It will be seen, on a careful examination of the instruction, that it was intended to avoid any decision of the question whether there was a subsisting and conclusive survey of the common by the authority of the United States, notwithstanding the act of the Secretary of the Interior in setting it aside, and which would prevent the assertion of any claim by the plaintiff to land not included in such survey. The meaning of the instruction is, that the claim of the plaintiff cannot be sustained without a survey which includes the property in dispute. Whether the instruction was given upon the idea that the claim to common was so indefinite as to require a survey, before the rights under it could attach to any particular tract, or upon a construction of the documents which were filed with the recorder in support of the claim, by which the court regarded the claim to common as south of the village, it is not easy to de-

termine.   But if, in either or any view of its meaning, it can be sustained as correct in law, it is proper so to regard it.

The Supreme Court of the United States, in *Mackay* v. *Dillon*, 4 Howard, 421, says : "By the first section of the act of 1812, congress confirmed the claim to commons adjoining and belonging to St. Louis, with similar claims made by other towns.   But no extent or boundaries were given to show what land was granted ; nor is there anything in the act of 1812 from which a court of justice can legally declare that the land set forth in the survey, and proved as commons by witnesses, in 1806, is the precise land congress granted ; in other words, the act did not adopt *the evidence laid before the board for any purpose ;* and the boundaries of the claims thus confirmed were designedly, (as we suppose,) left open to the settlement of the respective claimants by litigation in courts of justice or otherwise."   The survey filed with that claim was a private survey, made in 1806.   The court declares that the act confirming claims of this description did not adopt any of the evidence of the claims laid before the board, but designedly left open the question of boundaries to be settled by litigation.   If the question of boundary arose, and no survey by the United States authority was produced, the extent and locality of the claim confirmed could only be determined by evidence to be given on the trial of a cause, showing either a Spanish concession or other document, as a survey, giving boundaries ; or the user of a particular tract, as common, under the Spanish government.

Since the decision of this case in the court below, the Supreme Court of the United States, in the case of *Guitard et al.,* v. *Stoddard*, not yet reported, has had under consideration the effect of this act of 1812, in relation to a private claim, and the opinion delivered by Mr. Justice Campbell, after reviewing the previous decisions, states as the result, " that the questions settled by the court are, that the act of 1812 is a present operative grant of all the interest of the United States in the property comprised in the act ; and that the right of the

grantee was not dependent upon the factum of a survey under the Spanish government."

After referring to the decisions made in this court upon the effect of the act of 1812, and expressing concurrence in their conclusions, the learned Judge proceeds to consider the effect of exhibiting proof of a claim to the recorder of land titles under the act of 1824, and also the consequence of a failure to exhibit such proof. He says, " this act makes it the duty of the claimants of town and village lots to proceed within eighteen months after the passage thereof, to designate them by proving the fact of inhabitation, &c., and the boundaries and extent of each claim, so as to enable the surveyor general to distinguish the private from the vacant lots. No forfeiture was imposed for a non-compliance. The confirmee, by a compliance, obtained a recognition of his boundaries from the United States, and, consequently, evidence against every person intruding, or claiming from the government *ex post facto*. The government did not by that act impair the effect and operation of its act of 1812." Again, he says, " the question of boundary, under the act of 1812, as it was decided in *Mackay* v. *Dillon*, was left open to the settlement of the respective claimants, by litigation in the courts of justice or otherwise. Nor has this court, in any case, decided that statutes, which operate to confirm an existing and recognized claim or title, with ascertained boundaries, or boundaries which could be ascertained, are inoperative without a survey, or made one necessary to the perfection of the title. A survey approved by the United States and accepted by the confirmee, is always important to the confirmee, for, as is said by the court in *Menard's heirs* v. *Massey*, 8 Howard, 294, it is conclusive evidence against the United States, that the land granted by the confirmation of congress was the same described and bounded by the survey, unless an appeal was taken by either party, or an opposing claimant, to the commissioner of the land office. This consideration depends upon the fact that the claimant and the United States were parties to the selection of the land ; for, as they agreed

to the survey, they are mutually bound and respectively estopped."

According to the decisions of the Supreme Court of the United States, the act of 1812 confirmed the lots to individuals, and the commons to the towns, without regard to the question whether there had or had not been a previous survey, and the boundaries of the claims thus confirmed were left open for proof in any litigation that might arise.   In each case, the claim was confirmed, not upon the evidence filed before the board of commissioners, but as it had really existed under the Spanish government.   The party asserting the confirmation under the act was obliged to show the extent and boundaries of the claim confirmed.   If there was a paper title to property confirmed, the confirmation would be held of course to operate to the extent of the land embraced in such title; but if there was no such paper title, or if there was one which gave no limits to the claim, then the confirmation must rest upon proof of possession or occupancy under a claim of land within given limits.

In the case of the *St. Louis Common*, there never was a concession in any form, and the documents filed with the recorder were certain regulations by the syndicks of the town relating to the enclosures of the commons, and a survey made in 1806. The regulations gave no boundaries, and the survey was disregarded in *Mackay* v. *Dillon*.   Yet there was an enclosure of the commons under the Spanish government, and the land within the enclosure was used as commons.   Although the confirmation gave no boundaries, and no document filed with the claim, except the private survey, gave any boundaries, and the survey filed was held not to be recognized by congress, still no person ever doubted that the confirmation had a subject upon which to operate, and that it operated upon the claim as it had been evidenced under the former government, by user of the property as commons.

In the present case, the confirmation gives no boundaries; there is no grant or other document that gives any specific boundaries, yet the confirmation may be shown to apply to land

which was held, used and claimed under the Spanish government, without producing a survey by the authority of the United States. Evidence was given on the trial for the purpose of showing that a line was run under the Spanish government, dividing the commons of St. Louis and Carondelet, and including the property now in dispute within the commons of Carondelet, and that it was used as a part of that commons. It is not necessary to say what weight this evidence was entitled to; the question was for the jury. If the land was shown to be within the inclosure of the commons of Carondelet, and used as a part of the commons, it would bring it within the operation of the statutory confirmation.

If we take the documents filed before the commissioners as evidence of the locality of the claim confirmed, we find no call from which we can determine that there were not commons claimed as well north as south of the village. The answer of the lieutenant governor to the petition of Gamache is, " that the land demanded by him is within the limits of land reserved for the purpose of furnishing wood necessary for the use of the village of Carondelet, and the demand which is made by Gamache cannot take place, nor no other concession be granted in the direction of a line taken from the end of the lands of the said village, and running parallel with the 'Mississippi one hundred and fifty arpens further down said river." This answer is not in itself a concession. It is evidence that land was reserved for the use of the village, and that such reservation included the tract asked for by Gamache. If it be held that the declaration that no other concessions should be made between the Mississippi and a parallel line extending one hundred and fifty arpens from the end of the lands of the village down the river, amounted to a reservation of that tract as a common, still, it is not even strong evidence that land on the north of the village was not then held and recognized as a part of the common.

The instruction then given to the jury in this case, which rendered it indispensable, in order to a recovery by the plain-

tiff, that a survey by the United States, embracing this land as a part of the village common, should be produced, was not warranted by the law as declared by the Supreme Court of the United States.

2. But it has been argued that, at the time this survey of the common was made, (1834,) there existed no power in the general land office to vacate an approved survey, and, consequently, it is still to be regarded as a subsisting survey, conclusive upon the rights of parties. This record does not show how the proceeding in opposition to the survey commenced in the general land office, or who complained of it, or when the objection to it was first made. This court is deeply sensible of the importance of maintaining surveys which have been long made, and which have become muniments of title, relied upon by our citizens in their business transactions. If a power to disturb them exists any where, it is a dangerous power, the exercise of which must be carefully watched. Remarks were made upon this point in the case of the *Inhabitants of Carondelet* v. *Dent*, 18 Mo. Rep. 290, which are applicable to the question as presented upon this record. We will not, therefore, pass upon the question of power in the department to vacate the survey of the commons of Carondelet, without an acquaintance with all the proceedings which resulted in that act.

3. But there is one view of the case which it is proper to present, in order to facilitate its final disposition. In *Menard's heirs* v. *Massey*, 8 Howard, it is clearly laid down that a survey, when regularly approved, is conclusive upon the United States that the land granted by the confirmation is the same included within the survey, and that when it is accepted by the confirmee, he and the government being parties to the selection of the land, and having agreed to the survey, are mutually bound and respectively estopped. The language of the court in that case is quoted in the later case of *Guitard et al.*, v. *Stoddard*, as stating the law.

In this case, a survey made in 1834, and approved in that year, appears to have remained as the approved and recog-

nized survey of the commons of Carondelet until January, 1853. In the mean time, a tract of land contiguous to the common, as thus surveyed, is selected by the state as a part of the public land granted to her by congress, and the title of the present defendant, claiming under the state, is perfected by a patent dated February 27th, 1850. Here, then, the United States, many years after the survey was made and approved, and, as far as we can see, many years after the survey was accepted and acted upon by the authorities of Carondelet, have disposed of the adjoining land, and the title to it has been regularly completed.

There is evidence upon the record that the corporate authorities of Carondelet were cognizant of the making of the survey in 1834 ; deputed persons to attend the surveyor and to carry the chain ; received the report of the persons so deputed that the survey was completed ; caused a copy of the plat to be procured and exhibited as the true survey of the commons ; directed the lines to be marked with stones ; divided the land included in the survey into lots conforming to the exterior lines of the commons, as surveyed, and disposed of such lots ; procured a certificate of confirmation of the commons to be issued by the recorder of land titles, based upon and referring to this survey ; used the survey in litigation as the correct survey of the commons ; thus giving the strongest evidence of consent to and acceptance of the survey.

Now, taking the law to be clear, as laid down in *Menard* v. *Massey*, that the parties to a confirmation may, by agreeing to the selection and survey of land confirmed, be " mutually bound and respectively estopped," this case may be easily settled by finding the fact of the consent to the survey by Carondelet, and that it stood as the approved survey when the state selected the land in dispute.

A survey regularly made and approved is conclusive upon the government that the land within the boundaries is the land granted, and the acceptance of the survey by the grantee is conclusive that *all* the land granted is within the boundaries.

City of Carondelet *v.* McPherson. .

A person claiming land from the United States, outside of the survey, has the benefit of the conclusiveness of the survey against the grantee.

Still, the fact of acceptance and consent to the survey by Carondelet is a fact to be found by a jury, and however strong the evidence may be, we do not feel at liberty to determine, as a matter of law, from the evidence upon the record, that the survey was so accepted and consented to, as to estop the city in this action from claiming land outside of the survey.

As has already been said, we do not find upon the record any account of the proceeding which resulted in the act of the Secretary of the Interior which has been considered as vacating the survey. The papers which have been copied into the bill of exceptions would appear to show that the survey stood approved and without objection, and certainly without appeal for some seventeen or more years. We do not examine the question of power to vacate a survey made prior to the 4th July, 1836, when the act to reorganize the general land office was passed. (5 U. S. Stat. at Large, 107.) We do not say within what time an appeal must be taken to the higher officers of the land department, admitting the power to review and vacate a survey to exist. But we are prepared to say that, where the power exists, it must be exercised in a reasonable time, and that, after a lapse of many years, with a survey standing as an approved survey, in all the land offices, and assented to by both the parties, a title regularly acquired on the faith of the correctness of that survey, is not to be disturbed by any dispute which may arise between the parties as to its correctness.

The instruction given by the court being considered erroneous, the judgment is reversed, and the cause remanded.