FUNKHOUSER, Plaintiff in Error, v. LANGKOPF, Defendant in Error.

1. A survey by the United States of the common confirmed to the village of Carondelet by the act of Congress of June 13, 1812, was not necessary to enable her to maintain an action for the possession of the same.

2. Nor was it necessary that such survey should be made in order that the statute of limitations might commence running against Carondelet in favor of an adverse possession of a portion of said common.

3. Previous to the passage of the acts of February 6, 1839, and of March 3, 1851, (Sess. Acts, 1839, p. 211, Sess. Acts, 1851, p. 148)—the former of which authorized Carondelet to *lease*, the latter to *dispose absolutely* of her common—she might have maintained an action of ejectment to recover possession of any portion thereof adversely held : consequently, the statute of limitations might have commenced running against her in favor of an adverse possessor.

*Error to St. Louis Land Court.*

This was an action in the nature of an action of ejectment to recover possession of lots numbered 172 and 173, in the subdivision of Carondelet common, south of the river Des Peres. Suit was commenced June 29, 1854. Defendant in his answer admitted possession of so much of said lots as was embraced by United States survey No. 3317, commonly called " Deschamps' survey ;" he denied the title of plaintiff.

It was admitted in evidence that the plaintiff had by regular chain of conveyances all the title of the town of Carondelet in and to the lots in controversy. The defendant set up a title under a confirmation by the act of Congress of July 4, 1836, to one J. B. Deschamps or his representatives. Defendant had all the title of Deschamps by regular conveyances from his representatives. It was admitted in evidence " that defendant and those under whom he claimed had had continuous possession of the land in dispute from the year 1825 to the present time, claiming the same as their own adversely to all the world."

The plaintiff asked the court to give the following instructions : " 1. The title of the inhabitants of Carondelet to commons under the acts of Congress of June 13, 1812, May 26, 1825, and January 27, 1831, and the official survey and designation of said commons by the surveyor general, is superior to the title of defendant under the confirmation of 1836. 2. There is no evidence in the case competent to overthrow or impair the survey and designation of the commons read in evidence by the plaintiff; and the jury will therefore regard the same as a valid and subsisting survey. 3. The statute of limitations did not commence to run against the inhabitants of Carondelet in respect to said commons until the date of the approval of said survey and designation by the surveyor general. 4. If the jury believe from the evidence that the survey of the Carondelet commons as [was] made by Joseph C. Brown and approved by the surveyor general of Illinois and Missouri on the 29th of July, 1834, and that the

action now pending was commenced on the 29th day of June, 1854, then the plaintiff is not barred by the statute of limitations." Of these instructions the court gave those numbered 1 and 2, and refused those numbered 3 and 4.

The defendant asked the court to instruct the jury as follows: " 1. The jury is instructed that the title of those claiming under the confirmation to Robidoux in this cause is better than that of those claiming under the confirmation of common to Carondelet. 2. If the jury believe from the evidence that the defendant and those under whom he claims title had been in quiet and uninterrupted possession of so much of the land in question as is included within the lines of the Deschamps survey, claiming to be the owners thereof for twenty years prior to the commencement of this suit, and if such claim has been under color of title, the defendant is entitled to a verdict ; and such claim has been under color of title if the jury believe the deeds read in evidence by defendant to be genuine." The court gave the instruction numbered 2 and refused that numbered 1.

The jury found for defendant.

*Field*, for plaintiff in error.

I. The court erred in allowing the defendant, upon proof of twenty years' possession of the premises in dispute, the benefit of the statute of limitations ; for the date of the incorporation of the inhabitants of Carondelet was not shown at the trial and does not appear on the record. The precise point was decided in Reilly v. Chouquette, 18 Mo. 225. According to this authority it was essential to the defendant's right to prescribe under the statute of limitations that the inhabitants of Carondelet were incorporated more than twenty years before the commencement of this suit.

II. Prescription under the statute of limitations did not begin to run against the plaintiff, claiming under Carondelet, in respect to a lot in the commons, until there was a survey and designation of the commons according to law. This suit was commenced within twenty years from the establishment

of the survey. It was approved July 29, 1834. (See West v. Cochran, 17 Howard, 416 ; Reilly v. Chouquette, 18 Mo. 225.)

III. The statute of limitation did not commence to run against the corporation of Carondelet until it was vested by the legislature of Missouri with the power of disposing of the land. The inhabitants of Carondelet were first incorporated August 2, 1832. The town first acquired its powers to lease its commons by the act of February 6, 1839. (Sess. Acts, 1839, p. 211.) The power to grant in fee was first granted March 1, 1851. (Sess. Acts, 1851, p. 158.) In Spanish times commons were inalienable. (New Orleans v. United States, 10 Peters, ——.) The treaty of cession contained a stipulation that all rights of property should remain inviolate. The act of Congress of June 27, 1831, relinquished the commons to the inhabitants of Carondelet " to be regulated or disposed of according to the laws of the state of Missouri." There was no law of Missouri in respect to the regulation or disposition of the land in dispute until 1839 and 1851. Up to 1839 the commons of Carondelet were left by the United States and the state of Missouri precisely in the same condition in which they were placed by Spanish despotism, a tract dedicated to the public and common use of the inhabitants for the supply of timber and the depasturing of cattle. Such property was not liable to prescription by the Spanish law. (Escriche, voc. prescripcion.) The civil law corresponded with the Spanish law. Nothing could be prescribed for unless it was the subject of grant. (Domat, § 2218.) The laws of France and of Scotland, following the civil law, adopted the same distinction. (Pothier Traite de prescription; Ferriere, Coutume de Paris, Article 113 ; Erskine's Institutes, 794 *et seq.* ; 2 Stair's Inst. 666 *et seq.* ; see also Duplessis Cout. de Paris, 487 ; Hoepfner's Comm. § 395.) The English law of prescription under the statute of limitations differs only in form from the civil law. The latter confers expressly a right ; the former in terms only bars a remedy. The difference is obviously nothing in substance. It has now come to

be settled that possession under the statute of limitations, by extinguishing the remedy of a former proprietor, confers a complete title on the possessor; and prescription under the civil and English laws are identically the same thing. (See Biddle v. Mellon, 13 Mo. 335; Reilly v. Chouquette, 18 Mo. 225.) Possession, to constitute a bar under the statute of limitations, must be *adverse* to the true owner. The term " adverse possession," taking the place in modern times of the old word " disseizin," has acquired in the law a technical signification. It always implies a claim and color of title on the part of the possessor. Where no claim of title exists, the possession is not adverse in law, and however long continued will never ripen into a title against the true owner. If, as in Biddle v. Mellon, 13 Mo. 335, nothing more appears than the fact of possession, the possession itself will be regarded as sufficient evidence of a claim of title, and the statute of limitations will apply. But if qualifying circumstances are shown—as, first, if the party in possession disclaim title in himself; or, secondly, if he has in any manner admitted the title of the true owner; or, thirdly, his title as claimed be void on its face; or, fourthly, it be obtained by fraud—in all these and like cases the actual possession is not regarded as adverse, and will not furnish the foundation of a legal title. (See Angell on Lim. chap. 31, sec. 11; Adams' Eject. 455 *et seq*.) It would be absurd to allow the defendant to set up a claim of title, in a court of justice, to land in which the law of the state declared no such title could exist.

*Gantt*, for defendant in error.

I. The first point made by counsel for plaintiff in error is untenable. It appears that at a certain period the town of Carondelet existed. How come that court to recognize that existence at all? Was the act that gave it being before the court? If so, the court knew by that act that its corporate life dated back as far as August, 1832. If not, the court could only know of its corporate existence by means of tak-

ing judicial notice of the act of incorporation. It is altogether fatal to the plaintiff's case that there was no evidence of such incorporation before the court below; for, if so, plaintiff could have had no title to the land under Carondelet.

II. It was not necessary that a survey should be made of the commons before the statute of limitation could commence running against Carondelet. This point was made in the case of Chouquette v. Barada, 23 Mo. 331, and in a very pointed manner disregarded by the court. It is to no purpose that we inquire respecting the rules for the regulation of common under the civil law.

SCOTT, Judge, delivered the opinion of the court.

This cause is made to turn on the statute of limitations. An admission was made on the trial that the defendant, and those under whom he claims, had had the continuous possession of the land in dispute from the year 1825. We conceive that this admission was intended to give the defendant the benefit of such a defence, and as at the trial no point was made on the necessity of proving the time of the incorporating of Carondelet, it would operate as a surprise on the defendant to take advantage here of his failure to make such proof.

It was maintained for the plaintiff that the town of Carondelet was not barred by the statute of limitations, because her commons were not surveyed until the 29th of July, 1834, and, until that was done, the plaintiff's title attached to no particular land, nor could a court of justice ascertain its boundaries. We do not consider that the doctrine of the case of West v. Cochran, 17 How. 416, is applicable to confirmations made by the act of June 13, 1812. It has always been understood that that act, by its terms, passed a perfect title to the confirmee, and, upon proof of his inhabitation, cultivation or possession of the lot sued for prior to the 20th of December, 1803, and the continued existence of his claim

until the passage of the act, he was entitled to recover. If the land inhabited, cultivated or possessed could be identified as the land claimed and sued for, to the satisfaction of the jury, by any evidence written or verbal, the plaintiff was entitled to recover without any evidence of a survey made by the officers of the federal government or any one else. The case of Guitard v. Motard, 16 How. 507, holds that such a title passed by the act of 1812, as could not be affected in any way by a subsequent act of Congress passed May 26, 1824. Confirmations until the act of 1807 did not pass absolute titles from the United States. After the confirmation the ultimate title was still in the government, and until the land confirmed was surveyed and patented (when a survey was necessary) no perfect title to any land or any particular tract of land was conveyed to the confirmee. It appertained to the United States executive officers to designate and set apart the land confirmed to the claimant; and until this was done it could not be said that he was entitled to any particular part of the earth's surface. This we understand to be the doctrine of the case of West v. Cochran, and we do not conceive that it is applicable to the case of a complete title emanating from the United States by a legislative grant. Indeed we consider the language of the court in that case as maintaining this view—language so plain that it can not be misconceived. On page 415 the court says : " It was competent for congress to take up these titles or rights, and act on them either by legislating directly that each claimant should be confirmed and have a perfect title to his actual possession, lawfully acquired under France or Spain, without ascertaining in the act of confirmation, or by any special means provided therein, the bounds of claims confirmed. But it was also competent for congress to provide that, before a title should be given to any possessor, the exact limits of his possession and the title which the United States was to give should be defined, and that this should be done by such agencies and in such manner as might be fixed by congress." The court here evidently has in contemplation confirmations

under the two acts of 1812 and 1807, and contrasted the effect of such confirmations. This is made plain by what is said on the succeeding page, where it is remarked that congress might have said, as was done in the case of the St. Louis town lots and out-lots by the act of 1812, that each man should own what he lawfully possessed under the former government; and, if congress had done so, then the question would have been in this instance a matter of fact to be tried by a jury as to what the plaintiff did formerly possess and consequently own. Although the preceding remark in its language is confined to "town lots and out-lots," yet it is obvious that they were used as examples or illustrations and with no view to limit the act to such lots, as its terms and the reason of it would apply as well to the commons as to any other private property enumerated in it.

Another point made by the plaintiff is, that the statute of limitations did not begin to run against the corporation until it was vested with the power of disposing of the land, which was not conferred until March, 1851; that this want of a power of disposal in the corporation placed the lands out of commerce, and by the principles of the civil and Spanish law things out of commerce could not be prescribed for. We do not regard the doctrine of the Spanish or of the civil law in relation to the imprescriptibility of things out of commerce as having any application in this state since the introduction of the common law, whatever may have been its influence anterior to that event, a matter about which it is not now necessary to express an opinion. Angell, in his work on highways, says, that the doctrine of the earlier cases, that there can be no loss of the public right by mere non-user, has to some extent been departed from in more modern decisions. (Angell on Highways, 310.) We do not see any difference between the commons owned by the town and lands owned by any other corporation in trust for a special purpose. The principle is not apparent which secures the land in one case more than the other from the operation of the statute. It is not seen how the vesting of the legal title

to land in a body natural or corporate, without the power of alienation, can protect it from the operation of the statute. The distinction in this respect between an individual and a corporation is scarcely discernible. The statute of limitations is a statute of repose, and extends to all the lands in the state the title to which has passed from the United States. The test of the applicability of the statute is the incapacity of the defendant to sue, and not the existence or non-existence of his right of disposal. The statute of limitations now in force would seem to bind the state. But if the state was not bound by the statute, that principle would not extend to lands held by corporations under no disability to sue. In the case of McPherson v. Carondelet, 20 Mo. 192, and the City of Carondelet v. The City of St. Louis, 25 Mo. 462, it was held that the City of Carondelet could maintain an action on her title to commons without a survey.

The act of 22d December, 1824, concerning commons (R. C. 1825), gave the trustees or body corporate of any town authority to prosecute for all trespass committed on the commons belonging to the town. The act was continued in force by the revised code of 1835. (See R. C. 1835, tit. Laws.)

In the examination of this controversy we have not overlooked the principle of the case of Menard's heirs v. Massey, 8 How. ——, which maintains that a confirmation by act of congress, which passes a perfect title, may be of so indefinite a character, as to description, as not to prevail against a subsequent sale of land which may be included in a survey of the confirmation made after such sale.

The other judges concurring, the judgment is affirmed.