CITY OF CARONDELET, Appellant, v. CITY OF ST. LOUIS, Respondent.

1. Although an approved United States survey of the common confirmed to the inhabitants of a town or village by the act of June 13, 1812, is only *prima facie* evidence of the true location and extent of such common as against such town or village, yet if such survey should be accepted by such town or village, it would be conclusive and binding upon it as to the location and extent of the common confirmed, and it and the inhabitants thereof would be estopped to claim as a part of the commons of said town any land lying outside of said survey.
2. It is for the court to say what facts constitute an acceptance by a town or village of a survey of common, and work an estoppel.
3. The estoppel to be binding must be mutual; if the United States are not bound by the survey, neither is the claimant of common.
4. The existence of valid private claims within the limits of a survey of common would not be inconsistent with an estoppel as between the government and the village or town claiming common.
5. A survey of common, if accepted at all, must be accepted as an entirety; it can not be accepted in part and rejected in part.

*Appeal from St. Louis Land Court.*

This cause has heretofore been before the supreme court. (See Carondelet v. St. Louis, 25 Mo. 448. On the trial an immense mass of evidence was adduced. It is deemed unnecessary to set it forth. The court, at the instance of the plaintiff, gave the following instructions: " 1. All the right, title and interest of the United States in and to the commons of Carondelet was vested in the inhabitants of Carondelet on the 13th of June, 1812, according to the extent and boundaries of the said commons as the same existed and had been claimed and used by the said inhabitants in common prior to and until the 20th day of Dember, 1803." " 22. If the jury find for the plaintiff, and further find that the defendant had knowledge of the plaintiff's claim five years before the commencement of this suit, then the plaintiff is entitled to recover as damages for rents and profits the value of such rents and profits for five years before the commencement of this suit and from the commencement of this suit up to this date ;

and the jury shall further find the value of the monthly rents and profits of the premises in question." "24. If the jury find from the evidence that before, at the time of, and after, the survey of Brown of the commons of Carondelet of 1834, the board of trustees of Carondelet claimed the commons of Carondelet on the north of the village to extend to the Sugar Loaf; and that said corporate authorities of Carondelet did not accept the said survey of 1834 as the true limit of the commons of Carondelet on the north, but continued from the time of said survey of 1834 to claim as their commons the premises in controversy as a part of their commons until the commencement of this suit, then the plaintiff is not estopped by said survey of 1834 from recovering the premises sued for in this action, if the said premises lie within the commons of Carondelet as used by the inhabitants of the village before the 20th day of December, 1803."

The court, at the instance of the defendant, gave the following instructions: "1. If the jury believe from the evidence that the survey, made in 1834 by Joseph C. Brown, of the common of Carondelet, was within the same year returned to the office of the surveyor general of public lands of Illinois and Missouri, and was in that year approved by such surveyor general, and that that survey is now the approved survey of said common as recognized by the Land department of the United States; and if the jury further find that the board of trustees of said town of Carondelet were notified by said Brown, before said survey was made, that he had received his instructions, and would commence the work at a time named; that said board of trustees appointed a committee to superintend the survey; that afterwards said committee reported to said board of trustees that Joseph C. Brown had completed the survey of the common, and that the duties assigned them were duly performed; that said trustees ordered the persons employed in said survey to be paid, and appointed Joseph Chattillon to set up a stone every half mile on the line of said commons where necessary in order to designate the line properly; and if the jury further

City of Carondelet v. City of St. Louis.

find that afterwards and within the year 1834 the board of trustees of said town of Carondelet obtained a plat of said survey of the commons and a confirmation certificate issued by the recorder of land titles and based upon said survey, and ordered said survey and confirmation certificate to be filed in their office, and directed the register to have the survey framed for the use of the town ; and if the jury further find that afterwards in the year 1839 and subsequently thereto the board of trustees of said town of Carondelet caused the land included within said survey to be subdivided into lots or tracts, conforming in such subdivisions to the exterior lines of said survey as the boundary of the commons, and did proceed to dispose of said lands according to such subdivisions by leases for ninety-nine years, renewable ; and if the jury further find that the corporation of said town of Carondelet, in different suits at law in which the title to the commons of said town came in question, did exhibit and give in evidence the said survey as the regular and approved survey of the commons of said town ; and if the jury further find that the said corporation of Carondelet, for fifteen years after the said survey was approved and recorded, made no application to the Land department of the United States to have said survey set aside or changed—then these facts are in law an acceptance of such survey by the corporation of Carondelet; and such acceptance estops the plaintiffs from claiming as a part of the commons of said town any land lying outside of said survey.  10. But if the jury believe, from the evidence, the facts set forth in instruction numbered one given for defendant to the jury, then no claim of commons by the corporate authorities of Carondelet outside of the survey by Brown of 1834 should be regarded by the jury, unless made and insisted on in the Land department of the United States, and as a claim upon or against the United States for commons outside of said survey."

Many instructions asked by the plaintiff were refused by the court.  It is deemed unnecessary to set them forth. The jury found for the defendant.

*A. Leonard* and *B. A. Hill*, for appellant.

I. Carondelet has shown by acts of possession a legal title to the land in controversy under the act of Congress of June 13, 1812, as being part of their commons, and this title must prevail unless it has divested itself of it by some act of its own competent to produce that effect, or unless a paramount adverse title has been shown. The inhabitants were in Spanish times in possession of part of the royal domain as commons of their village. It may be admitted that the possession of commons by the French and Spanish towns was a mere precarious possession at the will of the king. (3 Mart. 307, 673; 6 Mo. 511.) The act of 1812 turned, *proprio vigore*, this actual possession into an ownership. A mere condition of fact became by that act a condition of right. (6 Mo. 511; 2 How. 345; 4 How. 421; 16 How. 494; 17 How. 416; 2 Mo. 192; 25 Mo. 448; 23 Mo. 532.) It is not necessary that there should have been a formal grant of commons, or a designation by survey of a specific piece of ground to be used as commons, or that the land should fall within the outboundary line as run.

II. Carondelet has not divested herself of her original title. The doctrine of Menard's heirs v. Massey, 8 How. 314, in reference to the acceptance of a survey, is not applicable to the present survey; and if it be, the question of acceptance, according to Carondelet v. McPherson, 20 Mo. 203, in which case this doctrine of acceptance was first applied to such a survey as the present, is a question of fact, and not a question of law to be determined by the court, as was done in the present case by the court below. In Menard v. Massey the grant was of a quantity of land at a designated locality, and no title passed until the survey was made. When the survey was made the claimant took the land embraced in it, or he took nothing. The reason of the rule is not applicable to such a survey as the present. Assuming, however, that this doctrine in Carondelet v. McPherson is to stand as the law, it is part of that doctrine that the question of accept-

ance is one of fact and not of law. Here the question of acceptance was not only withdrawn from the jury, and the law ruled to be, that if the particular facts recited in the defendant's first instruction were true they constituted an acceptance of the survey as a matter of law regardless of all the other qualifying acts of the party in relation to the same matter; but the court went even beyond this, and declared in substance that if the recited facts were true the plaintiff was estopped from recovering any land outside of the survey, although Carondelet had always refused to accept the survey as fixing the true limits of the commons on the north, and had always continued to claim the land now sued for as a part of the commons, provided this claim had not been made and prosecuted before the Land department of the United States. (See 12 Wend. 130; 16 Wend. 285; 7 Ind. 460; 6 Fost. 482.) The common law doctrine of estoppel can not be invoked in the present case. That doctrine is only applicable where there has been an admission by word or deed, upon which another has acted, and which can not be retracted without damage to the party that has acted upon the faith of it; and even then it is an estoppel only in favor of the party who has acted upon the admission and not in favor of others. This doctrine is not applicable to this case. (3 Hill, 219; 14 Mo. 487; 40 Maine, 354.)

III. The corporate authorities at the time they did the acts imputed to them in the defendant's instruction had no power to dispose of this property by an express transaction to that effect; and of course could not do this indirectly by the voluntary acceptance of a survey or by acquiescence in a division line. Until the act of March 1, 1851, the corporation did not possess the power of disposing of the property, or of changing the destination, either under the Spanish or common law or the statute law of this state. (1 Mackeldey, Comp. of Mod. Civ. Law, 158, § 157; 1 Pothier's Pandects, 45, tit. 8, art. 2; Thibaut's System of Rights, p. 95, § 115, 3 Partidas, Law 9, tit. 28.) The land was vested in the inhabitants as a society, to be used by them individually in

common for all the purposes to which they had previously applied it. By the Spanish as well as by the civil law things of this character (*res universitatis* and *res publicæ*, in the strict sense of the terms) are out of commerce and inalienable. The individual members of the community are entitled of right to use them for the purposes to which they are designed, or, in the language of our law, dedicated either by their own nature or by the provision of the former owner; and the community as an organized society have the administration of the property—that is, the power of regulating the use of it; but they can not dispose of it, or even change its destination, except with the consent of the sovereign, who represents in this matter the future generations of members, and with whose consent therefore the community may exercise the whole dominion over it, disposing of it as they think proper. (5 Partidas, law 5, tit. 5; 3 Louis. 239; Parish v. Municipality, 8 Louis. 149; 2 Domat, Pub. Law, lib. 1, tit. 8, secs. 2, 3, 16; New Orleans v. United States, 10 Pet. 723; Mayor of New Orleans v. Hopkins, 13 Louis. 330; De Armas v. Mayor of New Orleans 5 Louis. 145.) Things dedicated to the public use of the state, or to the public use of any local community, whether organized as a judicial community or not, seem by the common law, as it is now understood and administered in the United States, to be objects of the same character of ownership as the *res universitatis* and the *res publicæ* of the civil law. The necessity for such a modification of property has, it would seem, forced this kind of ownership into our legal system; and the rules that regulate it result from the nature of the property. The community in their corporate capacity have necessarily the power of regulating the enjoyment of it among their members, and the members themselves are entitled in that character to the use of it. The society, however, can not alien it, or change its destination, even with the consent of all their members; but this may be done with the consent of the sovereign, who acts in this matter from the necessity of the case, as the guardian of the future generations of members. (Cincinnati v.

White's Lessee, 6 Pet. 432; Barclay v. Howell's Lessee, 6 Peters, 500; New Orleans v. United States, 10 Peters, 712; Alors v. Town of Henderson, 16 B. Monr. 168; Langley v. Gallipolis, 2 Ohio, State, 111; The Commonwealth v. Alburger, 1 Whart. 469; Hunter v. Trustees of Sandy Hill, 6 Hill, 410; Warren v. Town of Jacksonville, 15 Ill. 236.) These commons could not be disposed of except by the express authority of the legislature. Acts of the corporate authorities of Carondelet done before they had authority to dispose of the property are incompetent in point of law to effect an alienation of it. The survey may be presumed to be correct as against the commons title; but when this presumption is met and repelled by proof showing that the survey cuts off a large proportion of the land, it can not be made effectual for this purpose by proof of acceptance or acquiescence on the part of the corporate authorities, unless they were expressly authorized by the legislature to compromise the rights of the community by such act. (New Orleans v. United States, 10 Pet. 736; Dugal v. Fryer, 3 Mo. 31; Porter v. Rummery, 10 Mass. 72.) The defendant's instructions assumed that if Brown's survey was approved by the surveyor general in 1834, it was the subsisting approved survey at the time of the trial. The head of the executive department had the right to revise the action of the inferior executive office. The survey made in 1855 is not Brown's survey of 1834; it would seem little less than absurd to call them identical in reference to the question of acceptance.

*A. Todd, Bay,* (city counsellor) and *McPherson,* for respondent.

NAPTON, Judge, delivered the opinion of the court.

The question upon which this case turned in the Land Court we consider as virtually settled by the previous decisions of this court, and fully supported by distinct enunciations of the same principle, and a similar application of it by the Supreme Court of the United States.

In the case of Carondelet v. McPherson, this court declared "that a survey regularly made and approved is conclusive upon the government that the land within the boundaries is the land granted, and the acceptance of the survey by the grantee is conclusive that *all* the land granted is within the boundaries." (20 Mo. 204.)

In the case now under consideration this court said: "If the survey of 1834 was approved it would be *prima facie* evidence of the true location and boundaries of the Carondelet common, and the plaintiff could not recover without showing that it was incorrect *and had never been recognized or accepted.* No formal act is necessary to constitute an acceptance, but it may be inferred from a variety of acts and circumstances; and though the acts of the party going to show that the survey had been accepted must be proven as facts to the jury, it will be the province of the court to declare, as a matter of law, the legal effect of particular acts bearing on the question. (Carondelet v. St. Louis, 25 Mo. 464.)

In Menard v. Massey, 8 Howard, 314, it is declared that "when the survey is made and the field notes returned to the surveyor general's office, and the description and plat made out in form and approved by the surveyor general, it is conclusive evidence, as against the United States, that the land granted by the confirmation is the same described and bounded by the survey, unless an appeal is taken by either party or an opposing claimant to the commissioner of the General Land Office. This consideration depends on the fact that the claimant and the United States were parties to the selection of the land, for, as they agreed to the survey, they are mutually bound and respectively estopped by it."

In Guitard v. Stoddard, 16 Howard, 512, Mr. Justice Campbell, in speaking of the importance of a survey, and in reference to a confirmation of a common field lot under the act of 1812, reiterates with approbation this language of Mr. Justice Catron in Menard v. Massey.

The position of this court in the case of the City of Carondelet v. The City of St. Louis, 25 Mo. 449, in relation to the

mode of establishing on the trial the fact of acceptance of a survey is not understood to conflict with the views expressed in the case of Carondelet v. McPherson. In the last named case, the facts upon which the question of acceptance depended had not been passed upon by the jury, either with or without instructions from the court which tried the case; and this court could not, as a matter of law, assume the existence of any number of facts, or any one fact, which, when established by a verdict, might in their estimation constitute an acceptance. Whether there was an acceptance or not was regarded as a fact to be established to the satisfaction of the jury; and so it was considered in the case of The City of Carondelet v. The City of St. Louis; but it was further added in this last case—what we suppose to be entirely consistent with the views expressed in the former one—that an explanation of the facts which legally constitute a binding acceptance is properly within the province of the court; and such was the view of a question analagous to this in the case of Minor v. Edwards & Price, 12 Mo. 137.

However this may be, we are clearly of opinion that it is for the court to say what acts will in law constitute an estoppel; and, aside from any mere verbal criticism upon the instructions of the Land Court and the order in which they are now found upon the record, they submit to the jury, substantially and *seriatim*, all the facts enumerated by the court in Carondelet v. McPherson, and almost in the language of that opinion, and declare that these facts, if they existed, constituted an acceptance of the survey.

Assuming, however, that these decisions are not binding upon us, or that they will admit of a different interpretation, and considering the question as an open one, our opinion in relation to the merits of this case is not changed. We are unable to perceive any thing startling or novel, much less the slightest appearance of injustice or harshness, in the application of this familiar doctrine of the common law concerning estoppel to the public surveys. On the contrary, its mere enunciation must commend itself to the sense of justice

and propriety entertained by all persons independent of legal enactments or judicial decisions.

A claimant of a specific tract of land, for the title to which he depends entirely upon the government, applies to that government for a confirmation. His application is heard and granted, and, at his instance, the government, through its authorized agent, points out by a survey the exact tract which has been thus confirmed or granted. The claimant accepts the land thus designated, takes possession and disposes of it. Shall he be allowed after this to turn round and say his land, thus granted and surveyed, accepted and disposed of, was not at the place where the government had located it, but at another and different place? Is there any principle of justice or natural reason which would tolerate such a course? On the contrary, is it not in conformity to common sense, as well as common right, that the party—who has thus declared, by the most deliberate and solemn action of which the subject matter admitted, that his confirmation was at the place where the government had located it—should not be allowed afterwards to deny it, however false may have been the original assertion? The common law doctrine of estoppel is not a technical one, nor is it an inflexible iron rule confining itself to a given state of facts, but a principle of justice and public policy, adapting itself to varying circumstances. It is merely an admission, made in a form so deliberate and so solemn, either by record, by deed, or by act, as that public policy will not permit it to be contradicted. We see no impropriety in applying it to the peculiar condition of things, which has sprung up here in reference to Spanish grants and United States confirmations and surveys. That it is just and equitable no one will deny; that it is in conformity to the spirit of the laws of the United States upon this subject, interpreted as they have been by the highest tribunal authorized to pass upon these laws, is manifested by what has already fallen from that court, and it is only upon the most technical grounds that the doctrine is objected to.

That the estoppel must be mutual in order to be binding

is plain. If the government is not bound, neither is the claimant. But the view entertained of Brown's survey of 1834, in the case of Sigerson v. Dent, is that the government was bound by it; and if the government was bound by it, Carondelet was equally bound by it if she accepted the land so surveyed as her common.

If the exclusion of the 1702 acres of land from Brown's survey for a military reservation had been made without the consent of Carondelet, and was a valid exclusion within the power of the government at the time it was done, we should of course concur in the views urged by the counsel for Carondelet in this case. In that event, the government of the United States not being bound by the survey, neither were the inhabitants of Carondelet, however much they may have insisted upon its validity, and whatever action they may have taken in reference to it. But we have in the record two ordinances of the city of Carondelet, and a deed of conveyance, giving undoubted proof of the consent of Carondelet to this reservation.

The existence of valid claims within the limits of the survey of Brown would of course form no objection to the estoppel either on one side or the other. The survey was not binding on third persons. Neither the government nor Carondelet could affect the title of adverse claimants by any agreement of theirs to a survey.

It has been urged in this case that, as the corporate authorities of Carondelet had not any power in 1834, or previous to 1851, to sell this land in fee simple, they could not, therefore, at the date of this survey, by any consent or acts of formal acceptance, part with their title to any portion of their common, outside of Brown's survey, confirmed by the act of 1812, upon *user* alone.

The titles, which have sprung up here, based upon inchoate claims originating under another government, and especially those concerning the commons attached by law and usages to certain ancient villages, have occasioned much legislation on the part of the federal government and on the part of the

state, and many decisions upon those laws by the courts of both, which, in truth, constitute mainly the law by which these titles are to be construed and governed. The common law and the law of Spain, and the civil law which was its basis, may guide or illustrate, but can not control. After all, we must follow that interpretation of the statutes relating to this subject which a long series of authoritative judicial decisions may require. The whole system is *sui generis;* and the security and stability of titles require that it should be so maintained; and general principles, abstractly correct, ought not and can not safely be taken, either from the Spanish or common law, to affect the stability of titles deriving their efficacy from the laws of the United States and of this state and judicial interpretation of those laws, and which have been passed from hand to hand upon the faith of these decisions and laws.

We do not mean by these remarks to admit that the conclusion arrived at in this case is inconsistent with any principle of either the common law, or the law of Spain under which this property in commons originated. All we mean to say is, that the titles growing out of this peculiar property, now based upon laws of the United States and of this state, and upon judicial interpretations of those laws, must be governed mainly by reference to these laws and decisions.

The question on the trial of this case was not, whether in 1834, the date of Brown's survey, Carondelet had any power to dispose of her commons in fee simple, but whether, either then, or at any time anterior to the trial, her acts in relation to this property amounted to an acceptance of the survey and an appropriation of the land within its limits as her common. Conceding that the corporate authorities of Carondelet possessed no power of making a fee simple title to these lands in 1834, and that her leases in 1838, for ninety-nine years, renewable at the pleasure of the lessee, are distinguishable from an absolute disposition of the common—although the difference for all practical purposes may be quite inappreciable—yet in 1851 her charter gave her an absolute con-

trol over this property and a power to convert these leases into fee simple titles. In 1834 the power to lease was given, and in 1839 the leases previously made were sanctioned by an express enactment of the legislature of Missouri. (Sess. Acts, p. 148.) Whether Carondelet possessed the power, therefore, in 1834 to part with any of her title to her common or not, she certainly had that power long before this suit was brought, and had, by her application to the legislature in 1838, and her application to Congress in 1848, expressly sanctioned her previous disposition of these lands in 1838. So that at the time of the trial, when her power could not be questioned, she occupied the same position in relation to her assent and ratification of Brown's survey as she had done previously when her power to give such an assent might have been questioned.

The history of this controversy, as exhibited on this record, shows that the authorities of Carondelet always acquiesced in the survey of their commons so long as the government of the United States showed a disposition to respect it. Previous to the survey, it is true, some of the authorities of Carondelet, and probably some of the inhabitants who had no authority, remonstrated most earnestly, and perhaps justly, against Brown's survey of the St. Louis common, which, as they alleged, encroached upon their common on the north. But when Brown's survey of their common was made, embracing as it did several thousand acres more than their original claim in quantity called for, no further complaint was made, at least to the government, and it was not until the officers of the government commenced efforts to overturn this survey that Carondelet sent up her remonstrances to Washington. The controversy was then kept up; but as the government finally acquiesced in the survey, and the original approval of the surveyor general was allowed to stand, the same rule should apply to Carondelet, and both parties be held equally bound.

It is hardly necessary to add—what has already been distinctly declared by this court in the case of Carondelet v.

McPherson—that a survey of a confirmation is a survey of the *whole* confirmation, and that it must be received by the claimants as it is offered by the government as an entirety. The survey purports to embrace all the land within the claim ; and if accepted at all, it must be. taken in the sense in which it is granted. ˙ Carondelet can not accept a survey of 9,000 acres as a satisfaction of her claim under the act of 1812 for common, and at the same time be allowed to assert that there remains land outside of the survey within the confirmation. Such is not the purport or intendment of the law; and, as the government never makes, and is indeed not authorized to make, any such partial surveys, so the party that takes them must receive them in the sense in which they are given. Upon any other construction a survey could not be held binding on the government. Judgment affirmed. ˙

Scott, Judge, dissenting. .I am in favor of reversing this judgment on account of the instruction given by the court below. For my views on this subject see the opinion filed by me in the case of Dent v. Sigerson, decided at the present term of the court.